**Madrith Bennett CHAMBERS**
v.
**The UNITED STATES.**
No. 141–70.

United States Court of Claims.
Oct. 15, 1971.

Elliott C. Lichtman, Washington, D. C., for plaintiff. Joseph L. Rauh, Jr., Washington, D. C., attorney of record for plaintiff. John Silard, Rauh & Silard, Washington, D. C., of counsel.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This is a suit for back pay with jurisdiction asserted under 28 U.S.C. § 1491, which provides, *inter alia:*

> The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, * * *.

> * * * * * *

The basis for the action is a finding by the Director of Equal Employment Opportunity for the Department of Health, Education and Welfare (HEW),

that plaintiff had been denied equal opportunity for employment because of racial discrimination in violation of Executive Order 11478, 34 Fed.Reg. 12985 (1969). Both E.O. 11478, and its predecessor E.O. 11246, 30 Fed.Reg. 12319 (1965), were promulgated by the President pursuant to 5 U.S.C. § 7151, Supp. V (1965–1969), which provides:

It is the policy of the United States to insure equal employment oportunities for employees without discrimination because of race, color, religion, sex, or national origin. The President shall use his existing authority to carry out this policy.

E.O. 11246 was in effect at the time plaintiff was denied employment, but the following pertinent passages are common to both Orders:

Section 1. It is the policy of the Government of the United States to provide equal opportunity in Federal employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, or national origin, and to promote the full realization of equal employment opportunity through a continuing affirmative program in each executive department and agency. This policy of equal opportunity applies to and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement, and treatment of civilian employees of the Federal Government.

Sec. 2. The head of each executive department and agency shall establish and maintain an affirmative program of equal employment opportunity for all civilian employees and applicants for employment within his jurisdiction in accordance with the policy set forth in section 1. * * *

* * * * * *

Sec. 4. The Civil Service Commission shall provide for the prompt, fair, and impartial consideration of all complaints of discrimination in Federal employment on the basis of race, color, religion, sex, or national origin. * *.

Procedures for the consideration of complaints shall include at least one impartial review within the executive department or agency and shall provide for appeal to the Civil Service Commission.

* * * * * *

Plaintiff, a black resident of Beckley, West Virginia, had, in early 1965, made application to the district office of the Social Security Administration (SSA) located in that community, for employment as a clerk-typist, GS–4. She was interviewed by District Manager Billings, and he made the customary reference checks. He learned she was technically qualified, and the references were favorable, so he offered her a position. She was unable to accept it because in the meantime she had secured employment at the Beckley Appalachian Regional Hospital (BARH). She worked there for approximately two years, resigning in 1967. At that time she again sought employment with the local SSA office, since a position there was once again available. This time, however, because of a reference report which he considered unfavorable, Mr. Billings refused to recommend her for employment. The report was to the effect that the BARH would not rehire her because "she was a perennial troublemaker who, during her BARH employment, was not averse to frivolously alleging racial discrimination and calling in the NAACP." On March 17, 1967, Mrs. Chambers was advised that she would not be employed. Another black person, Mrs. Chambers' cousin, was hired instead.

Shortly thereafter she filed a complaint with the SSA alleging that she had been denied employment because of racial discrimination. A hearing followed at which witnesses testified for both sides. However, there was no inquiry into plaintiff's charges against BARH because it was considered to be beyond the jurisdiction of SSA. Following the hearing, the examiner filed a report containing summaries of testimony, findings of fact and recommendations. One of the fact findings was that

"but for the reference report submitted by the BARH management employees, [plaintiff] would have been recommended for employment by the District Manager." The Government has not challenged this finding in the instant proceeding and counsel openly conceded the point during oral argument. We are, of course, not bound by this concession if all other facts are to the contrary. *Cf.* H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115 (1965). However, according to the report, the finding was based on a statement to that effect by Mr. Billings himself, rather than merely an inference drawn by the hearing officer. This is not surprising in view of Mr. Billings' prior knowledge of plaintiff's qualifications and reputation which had previously led him to offer her a position. We think the finding has sufficient support in the record and accept the defendant's "stipulation" if we may so designate it.

The hearing officer also found that Mr. Billings had made no attempt to verify the BARH report but accepted it at face value and assigned it "crucial weight" in his decision. The hearing officer held this to be no error "under existing, applicable policies and regulations," nevertheless, he asked whether employing agencies had an obligation, in view of equal employment policies, to determine the validity of an unfavorable reference report "where, as was the case here, the report is crucial as to the decision to be reached *and* the potential complainant's counterallegation is that the report reflects discrimination of the kind proscribed by regulations." Notwithstanding his ultimate finding was that plaintiff "was *not* discriminated against, because of race, by the Social Security Administration and/or the district manager." This report was approved by SSA officials who felt that the hiring of another black person for the same job was proof that there had been no discrimination against plaintiff.

At plaintiff's request the hearing officer's report was reviewed by the Director of Equal Employment Opportunity

for HEW, resulting in a reversal of the finding of no discrimination. The Director criticized the hearing afforded plaintiff in the following language:

\* \* \* the SSA District office in Beckley, West Virginia, failed to answer Mrs. Chambers' charge that it operated in and was unduly influenced by an environment of racial discrimination. Furthermore, it offered no data on the racial composition of its office, its hiring practices or implementation of affirmative action. Mrs. Chambers was indeed discriminated against, and we feel that the SSA personnel involved in this case were cavalier in their denial of the serious charge of racial discrimination.

\* \* \* \* \* \*

\* \* \* the argument that the hiring of one Negro obviates the charge of discrimination is not sufficient of itself to answer the charge that racial factors formed the basis for complainant's personal denial of employment with the SSA.

\* \* \* \* \* \*

The question posed by the hearing officer was apparently answered in the affirmative. The Director considered it "significant that Mr. Billings did not even consider that [plaintiff] might have had reasons for charging racial discrimination and more importantly, within the Federal context, her right to file a complaint of discrimination." The decision, based solely on an analysis of the SSA hearing officer's investigative report was:

\* \* \* that the denial of equal opportunity for employment in the instant case was based substantially on the applicant's previous racial discrimination complaint and that such denial constituted a violation of Executive Order 11478 and Department regulations pursuant thereto.

■ The defendant by its counsel concedes the discrimination. The underlying facts being undisputed, what is involved, evidently, is an interpretation of the Executive Order by the agencies

authorized to administer it. Such interpretations have special weight if not arbitrary or capricious, not mere whim or caprice, even if a court might disagree. Houston v. United States, 297 F. 2d 838, 842, 156 Ct.Cl. 38, 46, cert. denied, 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 56, reh. denied, 371 U.S. 906, 83 S.Ct. 204, 9 L.Ed.2d 167 (1962). This would be true even if, as in *Houston*, one party was challenging the interpretation. Here, however, both parties in substance agree on it. Certainly it is possible to hold in good faith that it is racial discrimination against an applicant to turn him down because he complained of racial discrimination against him in another job, without inquiry whether such previous complaint was frivolous or *bona fide*. It is also not mere caprice to hold that discrimination against one black is not necessarily purged by hiring another black. The issue was not Mr. Billings' credibility, nor whether, subjectively, he did or did not entertain bias against minority races. It was, purely and simply, whether his own undisputed account of what he did showed that he had or had not fully performed the duties that E.O. 11246 made incumbent upon him as a hiring official in the Executive branch.

The usual proper handling of an open court concession is, we believe, to eliminate the conceded issue from further consideration by the court. There are exceptions, for example an attempt to establish the court's subject matter jurisdiction by concession, but they do not apply here. Thus in Wagner v. United States, 387 F.2d 966, 181 Ct.Cl. 807, (1967), the trial commissioner had submitted a recommended opinion dealing with two alternative grounds for recovery plaintiff had urged before him. In our *Per Curiam* the following appears, 387 F.2d at 967, 181 Ct.Cl. at 809:

> Before us the taxpayer explained in his reply brief and in oral argument that he did not expect to prevail on the first issue, considered separately. That is, absent the showing of discrimination he claimed he had made, he did not believe the facts in the rec-

ord demonstrated that the asserted tax was not lawfully assessed. This concession makes it unnecessary for us to inquire into the matter contained in the first branch of our commissioner's recommended opinion, and we do not do so. * * *

In adopting the recommended opinion, we deleted the portion that dealt with the conceded issue. We think a similar omission would be in order here, and the conceded issue is discussed beyond what is strictly proper only to satisfy the scruples of our dissenting judges. This case will in no way constitute a precedent as to the meaning of discrimination under the Executive Order.

The recommended remedy was that Mrs. Chambers be given "consideration for the next suitable position in SSA for which she qualifies and is available." Plaintiff felt this remedy was inadequate and she appealed further to the Civil Service Commission Board of Appeals and Review (BAR). She asked for immediate employment in the position which had been unlawfully denied her, retroactive and with back pay. The BAR granted her partial relief by directing the SSA to "offer Mrs. Chambers a position at the GS–4 level at Beckley, West Virginia, within 30 days of its receipt of the Board's decision." Her request for retroactive appointment and back pay was denied, however, because the BAR considered such a remedy as beyond its authority.

The appeal to the BAR constituted exhaustion of her administrative remedies; therefore she next filed suit in this court seeking back pay for the period between March 17, 1967, the date she was unlawfully denied employment, and March 9, 1970, the date she finally became employed. Both parties have moved for summary judgment.

We are confronted with a situation where defendant admits that it discriminated against an applicant because of race *and* but for that discrimination she would have been employed at a particular grade and salary on March 17, 1967. Presumably she met all proper qualifi-

cations. Presumably there was a vacancy and funds to pay the applicant were available. Presumably her selection would not have required resolution of any open discretionary question in her favor. The sole question for our determination is whether, in the circumstances, E.O. 11478 provides a legal basis for awarding back pay to such an *applicant* for Federal employment. We hold that it does.

There is nothing novel about this court affording a monetary remedy to claimants on the strength of Executive Orders and administrative regulations not expressly so providing. Under the doctrine of Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), we have many times awarded back pay to plaintiffs, both military and civilian, who demonstrated a violation of procedural rights guaranteed to them by valid departmental regulations. Glidden v. United States, 185 Ct.Cl. 515 (1968); Fletcher v. United States, 392 F.2d 266, 183 Ct.Cl. 1 (1968); Greenway v. United States, 175 Ct.Cl. 350 (1963), cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108, reh. denied, 385 U.S. 954, 87 S.Ct. 327, 17 L.Ed.2d 223 (1966); Daub v. United States, 292 F.2d 895, 154 Ct.Cl. 434 (1961); Starzec v. United States, 145 Ct.Cl. 25 (1959); Watson v. United States, 162 F.Supp. 755, 142 Ct. Cl. 749 (1958). In *Watson*, the court noted, 162 F.Supp. at 758, 142 Ct.Cl. at 756:

> * * * that neither Service nor Watson was claiming a violation of any procedural rights guaranteed by any statute whatever, but rather the violation of rights guaranteed by departmental regulations. If the regulations issued under the executive orders, which in turn were issued under the 1883 Civil Service Act, in the case of *Service* had the force and effect of law, and a discharge carried out contrary to the provisions of these regulations was therefore an invalid discharge, it is difficult to understand why the Watson discharge in violation of another regulation issued under the same 1883 Act, was not equally invalid.

In *Daub, supra,* the court noted, 292 F.2d at 897–898, 154 Ct.Cl. at 437–438:

> The Government points out that the plaintiff was a temporary employee who had no status either in the competitive civil service, or as a veteran. But, as we have shown, the Army had, by regulation, conferred upon its employees, including its employees who had no rights under the Lloyd-LaFollette Act, 5 U.S.C.A. § 652 or the Veterans' Preference Act, 5 U.S.C.A. § 851 et seq., the right to prescribed rational and uniform treatment with regard to their status as employees.
> * * *

In Simon v. United States, 113 Ct.Cl. 182, 190–191 (1949), the court said:

> * * *. It is not necessary, to the jurisdiction of this court to render a money judgment based upon rights conferred, that the contract, or regulation upon which the claim is founded contain a provision that denial of a legal right thereunder shall give rise to a cause of action for compensation or damages. This matter is taken care of by the broad jurisdiction conferred by § 1491, U.S.C., Title 28, *supra*. United States v. Wickersham, 201 U.S. 390 [26 S.Ct. 469, 50 L.Ed. 798].

It is true, as defendant points out, that these cases involved existing employees who were found to have been wrongfully discharged from Federal employment. Defendant correctly observes that in no previous case have we awarded back pay to an *applicant* for employment. We are cited to a line of cases stemming from United States v. McLean, 95 U.S. 750, 24 L.Ed. 579 (1877), which defendant contends support the proposition "that there is no legal basis for awarding plaintiff the salary for a position she never held." These cases involved employees who had been appointed to one position but were in fact performing duties of a higher paid position. The contention of those plaintiffs was that

performance of duties of the higher paid position entitled them to the pay of that position. They were in effect, suing for promotions. In *McLean, supra,* the Supreme Court established the principle that the power of appointment is within the discretion of the executive and held at 753, that, "courts cannot perform executive duties, or treat them as performed when they have been neglected." In Coleman v. United States, 100 Ct.Cl. 41, (1943), this court denied recovery to a plaintiff who had been appointed as a "substitute garageman-driver" but was suing for the pay of a "driver-mechanic" because he had allegedly been performing the duties of the latter position. The court said, 100 Ct.Cl. at 42:

> \* \* \*. Plaintiff is entitled to no more than the salary of the office to which he was appointed, whether or not he performed the duties of an office of a higher grade.

Like issues were involved in Amundson v. United States, 120 F.Supp. 201, 128 Ct.Cl. 80 (1954); Price v. United States, 80 F.Supp. 542, 112 Ct.Cl. 198 (1948); and Dvorkin v. United States, 101 Ct.Cl. 296, cert. denied, 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586 (1944). *See also,* Ganse v. United States, 376 F.2d 900, 180 Ct.Cl. 183 (1967).

In Tierney v. United States, 168 Ct.Cl. 77, 80 (1964), plaintiff claimed that an alleged wrongful transfer had prevented his being considered for a subsequent promotion to a higher position created by a reorganization. The court refused to analyze the merits of plaintiff's claim and denied recovery because:

> \* \* \*. The power of appointment is within the discretion of the head of a department. It is an executive function which involves exercising the discretion of the executive. \* \* \*. If this court were to grant recovery to plaintiff it would in effect bestow upon plaintiff a promotion which he never received. In so doing, this court would be making an administrative decision. Such action would be a clear usurpation by the judiciary of an administrative function. \* \* \*

Even had the plaintiff not been transferred, he might not have been chosen for promotion pursuant to the reorganization. When the reviewing court has determined that there has been substantial compliance with applicable regulations and statutes it has performed its proper function. It would be improper to substitute the supposed wisdom of the court for that of the agency in the exercise of executive discretion.

■■ The above cases correctly state the law and we adhere to the decisions therein. But they are not dispositive of the case at bar. The Supreme Court has, since Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), distinguished between discretionary acts of executive officials which are beyond judicial power to review, and ministerial acts which can be compelled by mandamus, Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934). But even as to discretionary acts, the Court has held that an administrative officer might exceed his authority "by making a determination which is arbitrary or capricious or unsupported by evidence." Dismuke v. United States, 297 U.S. 167, 172, 56 S.Ct. 400, 403, 80 L.Ed. 561 (1936). This court has utilized that standard in back pay cases. Blackmar v. United States, 354 F.2d 340, 173 Ct.Cl. 1035 (1965).

Here we are neither reviewing a discretionary act nor performing one. The executive agency has already made the determination that but for unlawful discrimination, plaintiff would have been hired on March 17, 1967. We are not asked to speculate even as to the grade, salary, or the date. Our only function here is to ascertain the plaintiff's rights which flow from that determination. *See* Vasey v. United States, 128 Ct.Cl. 754 (1954), and Smith v. United States, 119 F.Supp. 200, 127 Ct.Cl. 706 (1954). In *Vasey,* the plaintiff had been reclassified from Special Investigator, CAF–8, in the Treasury Department to Criminal Investigator at the same grade and salary. Shortly thereafter, all "Special" Investigators were upgraded to CAF–9.

The Civil Service Commission BAR held that plaintiff's reclassification had been improper and ordered that he be restored retroactively to the position of "Special" Investigator and given the benefit of any advance in grade. Since the determination to promote the plaintiff had been made by the BAR, the only question for the court was whether plaintiff was also entitled to back pay. We held that he was.

Defendant's primary reliance, however, seems to be on Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969), cert. denied, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115. The plaintiff in that case, a man of Italian ancestry, brought suit in the District Court under E.O. 11246, *supra*, alleging that he had, because of discrimination, been denied promotions during 11 years service with the Corps of Engineers. He pursued his administrative remedies in the same manner as the plaintiff here, but with a different outcome. The finding, affirmed by the BAR, was that the evidence did not support the allegations of discrimination. Judge (now Justice) Blackmun, wrote the opinion sustaining dismissal of plaintiff's action by the District Court. He adopted that part of the District Court's opinion which held, 415 F.2d at 1278:

> * * *. None of the executive orders or regulations which the complaint cites purports to confer any right on an employee of the United States to institute a civil action for damages against the United States, in the event of their violation, even if it should be established that plaintiff's failure to have been promoted * * * was in fact due to discrimination in violation of the Executive Orders pleaded.
> * * *

The court was of the opinion that the Tucker Act, 28 U.S.C. § 1346(a) (2), (conferring on the District Courts concurrent jurisdiction with the Court of Claims) was not broad enough to confer jurisdiction in such a case. Our line of cases, expressing a different view, apparently was not cited or considered.

 We think what this court said in *Simon*, *supra*, 113 Ct.Cl. at 192–193, provides the applicable rule of law:

> Defendant's position is based entirely upon an inference which it seeks to draw·from the absence in the Act of 1883 of an express provision that the denial of a right under a regulation, duly made pursuant to that Act, shall entitle the employee concerned to sue in this court. We think it is obvious that such an express provision was not necessary since Congress knew, in 1883, that it had already expressly given this court jurisdiction to hear, determine, and enter judgments upon such claims. * * *
>
> * * * * * *
>
> The statute (28 U.S.C. 1491) outlining the general jurisdiction of this court and the Civil Service Act of January 16, 1883, *supra*, are "in pari materia" and should be construed together. * * *

In promulgating E.O. 11246 and E.O. 11478, the President, it must be assumed, was well aware of the existing jurisdiction of the Court of Claims and the case history (partly recounted, *supra*) of back pay awards for violation of rights granted under Executive Orders and departmental regulations. Congress indicated its intent that 5 U.S.C. § 7151, *supra*, be more than merely hortatory when it instructed the President to "use his existing authority to carry out this policy" of equal employment opportunity. It is, of course, true that when Congress creates rights in individuals, "it is under no obligation to provide a remedy through the courts." *See* Lynch v. United States, 292 U.S. 571, 582, 54 S.Ct. 840, 845, 78 L.Ed. 1434 (1934). When it desires to exclude a class of claim from judicial review it knows how to do so. 38 U.S.C. § 211(a) provides that decisions of the Administrator of Veterans' Affairs:

> * * * on any question of law or fact concerning a claim for benefits or payments under any law administered by the Veterans' Administration shall be

final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision.

Article 76 of the Uniform Code of Military Justice, 10 U.S.C. § 876, provides:

> The appellate review of records or trial provided by this chapter, * *, are final and conclusive. Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, · * * *

But absent such a clear manifestation that access to the courts is prohibited where a specific right has been created, we think it is the intent of Congress that the general jurisdictional statutes are controlling. We find support for this conclusion, particularly as it relates to administrative denial of rights, in certain provisions of the Administrative Procedure Act, and the language of the Supreme Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967):

> * * * the Administrative Procedure Act, * * * embodies the basic presumption of judicial review to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 701(a). The Administrative Procedure Act provides specifically not only for review of "[a]gency action made reviewable by statute" but also for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. * * *

We have recently considered the effect of the Administrative Procedure Act as to agency action not expressly stated to be reviewable, in Moore-McCormack Lines, Inc., v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969). In this case, plaintiff's right to equal employment opportunity under 5 U.S.C. § 7151 and E.O. 11478 was denied her by action of the Social Security Administration. She therefore is a person suffering a "legal wrong because of agency action." There is no statute that precludes relief and the agency certainly has no discretion to practice discrimination. As we have shown, Federal employees have for many years been prosecuting pay claims in this court under the general jurisdiction provided by 28 U.S.C. § 1491. We think that the statute and Executive Order cited herein have simply added another class of persons entitled to seek relief thereunder, namely, applicants of minority races.

The Veterans' Preference Act of 1944, as amended, 58 Stat. 387, (now found in scattered sections of 5 U.S.C., Supp. V (1965–1969)) contained no provisions for back pay or for bringing suit in the Court of Claims, however, we have granted relief on countless occasions when the procedural requirements of that Act had not been complied with Mallow v. United States, 161 Ct.Cl. 207 (1963); Stringer v. United States, 90 F.Supp. 375, 117 Ct.Cl. 30 (1950); Wittner v. United States, 76 F.Supp. 110, 110 Ct.Cl. 231 (1948). We have also granted relief in other cases where there was no specific right to sue given by the applicable statutes. In Betts v. United States, 172 F.Supp. 450, 145 Ct.Cl. 530 (1959), an action for military disability retirement compensation, the court said, 172 F.Supp. at 453–454, 145 Ct.Cl. at 536:

> This court has, of course, no authority to appoint persons to public office. It does have jurisdiction to award them money damages as compensation for violations of rights granted to them by statute or regulation. * * *

In Weiss v. United States, 408 F.2d 416, 418, 187 Ct.Cl. 1, 5 (1969), we said:

> * * *. It is well established that it is within our jurisdiction to review and, in the appropriate case, reverse a decision of a Service Secretary which arbitrarily reverses a correction board's decision and findings. * * *

■ As we see it, when plaintiff made application for employment with a Federal agency, she came under the protection of the Executive Orders, which by terms and by implication, apply to applicants as well as employees. The very concept of "equal employment opportunity" must necessarily be concerned with persons seeking employment. Sec. 2 of E.O. 11478 directs agency heads to "establish and maintain an affirmative program of equal employment opportunity for all civilian employees *and applicants*" (emphasis supplied). The CSC is then directed to "provide for the prompt, fair and impartial consideration of *all* complaints of discrimination in Federal employment" (emphasis supplied). The Order draws no distinctions between employes and applicants and we think none was intended. It has been found that plaintiff's rights under E.O. 11478 have been violated and that she has been prejudiced thereby. She is therefore entitled to the only remedy this court is authorized to give, a money judgment.

Plaintiffs in the companion case of Allison v. United States, Ct.Cl., 451 F.2d 1035 (1971), decided today, have called our attention to Comp.Gen. B–165571, 50 Comp.Gen. —— (decided February 19, 1971), upholding the claim of a black applicant to back pay when discriminated against by being hired at Grade GS–9 when a white person would have been hired for the same duties at GS–11. The opinion distinguishes prior GAO holdings that back pay is unavailable in cases of discriminatory failure to promote, and would appear to be consistent with the distinction we draw here: between the usual no-promotion claim, such as *Gnotta, supra,* requiring the court to exercise administrative discretion if it grants relief and cases such as this, where administrative findings and concessions remove all discretionary elements from the case. We believe that the exercise of discretion is the true bar where it remains for exercise if plaintiff is to recover. We do not see any validity to a distinction between an old employee, not promoted, and a new one, not hired, in either case claiming pay for a job he never held.

Our research discloses only one case in this court which is not compatible with the decision reached here; Hyman v. United States, 157 F.Supp. 164, 138 Ct. Cl. 836 (1957). In that case, (not cited by either party herein) the plaintiff had been properly separated from Federal employment by a reduction in force. However, under applicable CSC regulations, she continued to have "re-employment priority rights" entitling her to be hired before certain other persons should a position for which she was qualified became available. Such a position did become available, but the agency refused to re-hire her. Upon appeal, the BAR ordered the agency to employ her with appointment retroactive to the date she should have been hired. This court refused to award back pay, holding, 157 F. Supp. at 168, 138 Ct.Cl. at 842 that she was not "entitled to be paid for a job to which she was not appointed and from which she was not, of necessity, removed." However, no case was cited as authority to support the decision and in restrospect, we think it was wrongly decided. Our decision here necessarily overrules *Hyman.*

It may be that this case has First Amendment implications such as were discussed in Swaaley v. United States, 180 Ct.Cl. 1, 376 F.2d 857 (1967), but since recovery is allowable under the Executive Order, we need not inquire into that possibility.

Accordingly, we hold that plaintiff can recover back pay from March 17, 1967, the date defendant admits she should have been hired, until March 9, 1970, the date she was employed pursuant to the Order of the BAR, less any amount she might have earned in the interim. Plaintiff's motion for summary judgment is granted and defendant's motion is denied, the amount of recovery to be determined under Rule 131(c) (2).

DAVIS, Judge (concurring):

Adhering to Judge Nichols' opinion, I wish to add some comment on the dissents, both of which discuss an issue not presented to us, not argued, and which, under our practice, should not be considered by the court.

I

When the case was briefed, argued orally, and submitted, both parties were agreed that plaintiff should be deemed to have been discriminatorily denied federal employment. This was, of course, the foundation of plaintiff's petition and argument. The operative administrative determinations were of the same view. The formal decision of the Director of Equal Employment Opportunity of the Department of Health, Education and Welfare said that "Mrs. Chambers was indeed discriminated against * * *", and "We find that the denial of equal opportunity for employment in the instant case was based substantially on the applicant's previous racial discrimination complaint and that such denial constituted a violation of Executive Order 11478 and Department regulations pursuant thereto." The Board of Appeals and Review of the Civil Service Commission declared that the Department "found that Mrs. Chambers' complaint of discrimination was substantiated", "that the Department's decision found that Mrs. Chambers was discriminated against because of her race in her failure of appointment", and "the Department found that Mrs. Chambers was subject to discriminatory treatment in 1967." The Commission did not overturn that finding; on the contrary, it sought to implement it.

In this court the Government did not challenge or reject, in any way, this administrative finding of discrimination. Its sole defense was that there is no basis in law for the award of back pay to a person denied government employment due to racial discrimination. Both in its brief and orally, the defendant conceded (or at least expressly declined to challenge) the finding of discrimination and of violation of the Executive Order. There is no argument on the point in either side's brief. In fact, as the case was submitted to the court, there was no evidentiary predicate for challenging the administrative finding since neither party had filed or proffered the transcript of the agency hearing or the HEW investigative report. The only parts of the record that we had before us were the formal decisions of the HEW Director of Equal Employment Opportunity and of the Commission's Board of Appeals and Review. That was the record on which we were asked by the parties to base our decision.

After oral argument, some of the judges asked, *sua sponte* and individually, for the agency transcript and the investigative report. These were supplied pursuant to the requests. The quotations in the dissents are taken from these documents, obtained after argument as a result of these requests.[1]

So far as I can tell, this is the first occasion (at least since I came to the court) on which a judge of this court has rejected *sua sponte,* in a government personnel case, an administrative finding favorable to the individual, even though the defendant has not asked us to overturn the finding but, rather, has acquiesced in it. We have had many instances in which (by administrative process) some benefit or relief was granted, or some prior adverse action rectified, but the claimant sought still further relief in this court on the basis of the administrative determination in his favor. Our uniform practice has been to accept the favorable personnel determination (if not challenged), and simply to decide whether additional re-

---

1. It is not uncommon for the court to request additional parts of an administrative record where they bear on a point presented for decision. This case is unique in that the requested portions of the administrative record bore only on a matter not put into issue and not presented for decision.

lief is warranted.[2] If the defendant is content to acquiesce in the basic determination, and to argue merely that the plaintiff has already had what is rightly coming as a result of that favorable holding, we do not interject ourselves into the merits of the determination by considering whether the Government's favorable administrative ruling was in fact correct.

This unbroken practice accords, of course, with the normal rule that courts deal only with the issues actually presented, as well as with the constraints we impose on pay-case plaintiffs—who are barred from raising in this court points that they failed to make before the Civil Service Commission. *See* Dargo v. United States, 176 Ct.Cl. 1193, 1201 (1966); Pine v. United States, 371 F.2d 466, 178 Ct.Cl. 146 (1967). In this case, the Government did not challenge, at the Commission level or the court level, the correctness of the administrative finding of discrimination, and neither side broached that issue before the court. Nevertheless, the dissents launch, on their own, an attack on the administrative determination.

Thus, what the dissenting opinions do is unique and contrary to our regular procedure. In my view, there is no warrant for this departure, and the opinions give no reason for such an unprecedented reaching out, in this particular case, to grasp and decide an issue not raised or before us.

## II

I have stressed that the merits of the finding of discrimination are not properly before us, but nevertheless, in order to minimize possible misapprehension by readers of these opinions, it is appropriate to point out the dissents' mistaken conception of the actual finding. Those opinions treat plaintiff as if she were simply a "troublemaker"; the discussion fails to recognize that racial matters were at the core of this complaint of "troublemaking."

The formal HEW decision was: "We find that the denial of equal opportunity for employment in the instant case was based substantially on the applicant's previous racial discrimination complaint and that such denial constituted a violation of Executive Order 11478 and Department regulations pursuant thereto." The reference to "applicant's previous racial discrimination complaint" was to the report from her previous employer, Beckley Appalachia Regional Hospital [BARH], that "she was a perennial troublemaker who, during her BARH employment, was not averse to frivolously alleging racial discrimination and calling on the NAACP." The HEW office which refused to hire plaintiff admitted that it had made no inquiry whether or not her complaints of racial discrimination while at the hospital were in fact frivolous, but simply accepted the hospital's report as true and a datum. The question then is whether it can be considered a violation of the Executive Order against racial discrimination for

2. Reported cases since 1962 include: Aflague v. United States, 309 F.2d 753, 159 Ct.Cl. 80 (1962); Kleinfelter v. United States, 318 F.2d 929, 162 Ct.Cl. 88 (1963); Russell v. United States, 320 F.2d 920, 162 Ct.Cl. 544 (1963); Schiffman v. United States, 319 F.2d 886, 162 Ct.Cl. 646 (1963); Morris v. United States, 163 Ct.Cl. 259 (1963); Barnes v. United States, 163 Ct.Cl. 321 (1963); Sofranoff v. United States, 165 Ct.Cl. 470 (1964); Akol v. United States, 166 Ct. Cl. 182 (1964); Akol v. United States, 167 Ct.Cl. 99 (1964); Lerner v. United States, 168 Ct.Cl. 247 (1964); Morris v. United States, 171 Ct.Cl. 220 (1965); Motto v. United States, 348 F.2d 523, 172 Ct.Cl. 192 (1965); Friestedt v. United States, 352 F.2d 530, 173 Ct.Cl. 447 (1965); Paroczay v. United States, 369 F.2d 720, 177 Ct.Cl. 754 (1966); Wason v. United States, 179 Ct.Cl. 623 (1967); Miller v. United States, 180 Ct.Cl. 872 (1967); Seebach v. United States, 182 Ct.Cl. 342 (1968); Hamlin v. United States, 391 F.2d 941, 183 Ct.Cl. 137 (1968); Biddle v. United States, 186 Ct.Cl. 87 (1968); Mross v. United States, 186 Ct.Cl. 165 (1968).

an agency to refuse to hire an applicant on the mere say-so of a former employer that she had improperly charged racial discrimination by that former employer.

There is considerable material bearing on this question. Section 704(a) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–3(a), provides (in relevant part): "It shall be an unlawful employment practice for an employer to discriminate against any of his employes or applicants for employment * * * because he has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, asserted or participated in any manner in an investigation, proceeding, or hearing under this title." [3] Statutory precedent foreshadows thus treating as a racial discrimination an employer's adverse action based on the employee's (or applicant's) standing up for his rights. Section 8(a) (4) of the National Labor Relations Act, 29 U.S.C. § 158(a) (4), makes it "an unfair labor practice for an employer * * * to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this chapter;" and Section 15(a) (3) of the Fair Labor Standards Act, 29 U.S.C. § 215(a) (3), has a similar provision as to the unlawfulness of discriminating against an employee who has filed a complaint. *Cf.* Edwards v. Habib, 130 U.S.App.D.C. 126, 397 F.2d 687 (1968) (outlawing evictions retaliating against the tenants' reporting of housing violations).

Under the Civil Rights Act, Pettway v. American Cast Iron Pipe Co., 411 F.2d 998 (C.A.5, 1969), holds that an employer cannot discharge an employee who, in the employer's view, has filed with the Equal Employment Opportunity Commission a false and malicious charge of racial discrimination against the employer. "The Act will be frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action." 411 F.2d at 1005. "The employer may not take it on itself to determine the correctness or consequences of [the allegedly false charge of racial discrimination]. Nor may the court either sustain any employer disciplinary action or deny relief because of the presence of such malicious material." 411 F.2d at 1007. The employer's good faith will not insulate him. 411 F.2d at 1005. *See, also,* Barela v. United Nuclear Corp., 317 F.Supp. 1217 (D. New Mex. 1970), holding it an unlawful employment practice under the Civil Rights Act to refuse to process an applicant's employment application simly because he had filed with the Equal Employment Opportunity Commission a charge of discrimination against another employer.

These materials demonstrate that, at the least, much can be said for the position on racial discrimination taken by HEW in plaintiff's case, and accepted by the Civil Service Commission. Moreover, the hiring of another black applicant, instead of the plaintiff, would not, of itself, show that there was no racial discrimination against her. It could very well be discrimination to refuse to take on a black who would insist on her proper rights, substituting another who would perhaps be more quiescent or docile. Nor would it be enough to disprove discrimination that the HEW official who rejected plaintiff may have been subjectivey free of personal prejudice; his decision "could remain discriminatory if founded upon testimony or evidence which was tainted by racial prejudice." London v. Florida Dept. of Health and Rehabilitative Services, etc., 448 F.2d 655, p. 657 (C.A.5, 1971).[4]

---

3. Section 703(a), 42 U.S.C. § 2000e–2(a), declares it "an unlawful employment practice" for an employer to discriminate on the ground of race (among other things).

4. The *London* opinion says: "It is much too superficial to reason that even though some of the complaints registered against plaintiff were racially motivated, London's rights were not impaired since the Welfare Board [the deciding tribunal] was not so motivated. Whatever the conscious motivations of the individual members of

COWEN, Chief Judge (dissenting):

The court's decision is based upon a pretrial stipulation of the parties that "the denial of equal opportunity for employment in the instant case was based substantially on the applicant's previous racial discrimination complaint and that such denial constituted a violation of Executive Order 11478 and Department regulations pursuant thereto." In most cases we accept the parties' stipulations but, as the court's opinion recognizes, we are not required to do so.

In Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917), the Supreme Court had before it a stipulation which the Court found was contrary to the facts shown in the record. In rejecting the stipulation and in deciding the case on the basis of the facts of record, the Supreme Court said:

> If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. If the stipulation is to be treated as an attempt to agree "for the purpose only of reviewing the judgment" below, that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented. "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. * * * No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard." [*Id.* at 289, 37 S.Ct. at 289 (footnote omitted).]

After a study of the administrative record, I am convinced that we are faced with a similar situation in this case. Therefore, I would reject the stipulation. It is an adoption verbatim by the defendant of a determination made by the Director of the Equal Opportunity Staff of the Department of Health, Education and Welfare on review of the facts set forth in an investigative report and in a transcript of the testimony of a formal hearing held at plaintiff's request. In my view, the administrative decision is not only without substantial evidentiary support in the record, but is also in direct conflict with the material evidence, including plaintiff's own testimony, that was received in the course of the investigation and the hearing. It is also contrary to the facts found by the investigator, who personally interviewed seven witnesses, and contrary to findings of the hearing officer, who heard the sworn testimony of plaintiff and of Mr. Dwight Billings, District Manager of the Beckley, West Virginia, Office of the Social Security Administration, the official charged with racial discrimination in this case.

The administrative proceedings began with an investigation and report of May 29, 1967, on plaintiff's complaint, which was made after the District Manager had denied her application for employment in 1967. It is important, I think, to examine carefully the specific charges made by the plaintiff. As found by the investigator, these were:

> 1. The district manager denied employment to her in March 1967, because of an inaccurate and demeaning reference report which was submitted by the BARH.
>
> 2. The district manager erred in assigning weight to the reference report. (Complainant is sure the report came from Charles D. Holland, who, being anti-Negro, discriminated against her during her employment at the BARH.)
>
> 3. Immediately prior to receipt of the reference report from the BARH, the district manager gave her direct indications that he would recommend her for employment if

the Board, its decision to transfer London could remain discriminatory if founded upon testimony or evidence which was tainted by racial prejudice."

the BARH reference report proved good—proof positive that, but for the report, she would have been employed by SSA.

The complainant believes that the sum of these elements amounts to racial discrimination against her by the SSA and/or district manager. However, she concedes that SSA and/or the district manager may not have discriminated against her directly, citing her firm belief that SSA and/or the district manager would have hired her in October 1965 had she not taken employment at the BARH.[1]

It is undisputed that Mr. Billings rejected plaintiff's application for employment on the basis of two reports which he received from plaintiff's last employer, the Beckley Appalachian Regional Hospital. The first was a report from her last immediate supervisor, Dr. Kistin, who stated that she was an adequate employee but that he would not reemploy her, because the hospital administrator questioned her ability to get along with her co-workers. The second was a report from the Administrator of the hospital in which it was stated that plaintiff was a perennial troublemaker who was not adverse to frivolously alleging racial discrimination and calling in the NAACP. The investigation report further recites that Mr. Billings stated that in view of the information submitted by the hospital, "he felt it was best, under these circumstances, to seek out and recommend employment of someone who was equally well qualified and about whom there was no question of potential incompatability with his existing work force."[2] After considering the testimony and other evidence which he received, the investigator made the following findings:

A. But for the reference report submitted by the BARH [management employees, complainant would have been recommended for employment by the district manager. *However*, neither the accuracy, of the report not [sic] the validity of its demeaning content has been determined.

B. The district manager assigned substantial—and crucial—weight to the BARH reference report. *However*, in doing so, he did not err under existing, applicable policies and regulations.

C. Immediately prior to receipt of the BARH reference report, the district manager gave the complainant direct or indirect indication that he would recommend her for employment if the BARH reference report proved good. *However*, his doing so was more an acknowledgment, on his part, of the complainant's awareness of her status vis-a-vis possible employment than a firm commitment to a definite course of action with respect to her application for employment.

D. Notwithstanding the basic findings outlined in A–C above, the complainant, in seeking employment, was *not* discriminated against, because of race, by the Social Security Administration and/or the district manager.[3]

\* \* \* \* \* \*

On July 5, 1967, after the receipt of the investigation report, Mr. M. D. Dewberry, Regional Assistant Commissioner, made the following recommendation to Mr. Zawatzky, Deputy Assistant Commissioner:

We recommend she be advised there was no discrimination based on race, color, religion or national origin. In her letter of June 27, 1967, she points out that we employed her cousin to fill the vacancy for which she was considered. Obviously, the selection was made between two minority applicants

---

1. Report of Investigation by Walter C. Statham, Assistant Regional Representative, BHI, Charlottesville Regional Office, at page 3.

2. Investigation Report at page 5.

3. Investigation Report at page 7. [Emphasis in original.]

—one with no prior service whose references were good, and one with prior service whose last employer in Beckley would not reemploy her. Also, the manager had some other reservations about Miss Bennett's attitude from several contacts with her that he considered of minor importance until the former employer questioned her ability to get along with coworkers. We did not investigation the situation at the Beckley Appalachian Regional Hospital leading to the poor reference, since this would not appear to be under our jurisdiction at the present time, even though the hospital is certified under Medicare. The manager has enjoyed a good working relationship with that hospital, and certainly would not have questioned the integrity of their reference regarding Madrith Bennett.

On July 20, 1967, Mr. Zawatzky wrote plaintiff that he had concluded that discrimination was not a factor in her failure to obtain employment in the District Office. However, he advised her of her right to a hearing in the event she was dissatisfied with the decision.

At plaintiff's request, a hearing was held on December 4, 1967. The transcript of the hearing contains the following testimony by plaintiff, in response to the questions of the hearing officer, Mr. Philip Janus:

Q Miss Bennett, as I take it, a central part of your charge is that, in acting on references received from the hospital, Mr. Billings and the Social Security office acted in a racially discriminatory way by not looking behind or into the events that led to the reference from the hospital. Is that correct?

A That is correct, sir.

Q I believe it is your position that, if the references had been satisfactory, you would have been hired.

A This is correct.

Q So, that, without leading, aside from this point—the references, you would not make a charge of discrim-

ination on the part of Mr. Billings or the Social Security office; that is, they were prepared to hire you.

A This is my feeling, sir.
(Transcript of hearing at page 5)

\* \* \* \* \* \*

A Well, as I earlier stated, this discrimination existed at the Beckley Appalachian Regional Hospital and it was transmitted by a reference check to Mr. Billings; it was just transferred from one institution to the other. Do you understand what I am saying?
(Transcript of hearing at page 6)

\* \* \* \* \* \*

A \* \* \* So, actually, it was racial tension and it was, in turn, transmitted to the Social Security Office. Whether Mr. Billings was aware of it, I have no knowledge of this, or what added to it in these regards.
(Transcript of hearing at page 7)

\* \* \* \* \* \*

MR. JANUS [Hearing Officer]: Let me ask you this. Do you have any reason to believe that Mr. Billings did not want to hire you and used this as a convenient excuse not to hire you? Do you feel that he is prejudiced?

MISS BENNETT: I can't very well say that. I've been in Mr. Billings' office, as he well knows, time and time again and he was always pleasant and he was always willing to take his time out to sit and talk to me and what have you and he told me to feel free to come in his office at any time that I wished to check and see if there was any vacancies and I truthfully couldn't say that Mr. Billings is prejudiced. I couldn't say this. It's just a matter that he got hung up through an unfavorable reference where racial tension was involved. That's the only thing I could say at this point.

(Transcript of hearing at page 11)

It should be pointed out that the plaintiff's testimony, quoted immediately above, was modified to some extent later during the hearing when she said:

\* \* \* Would you have hired me on the basis of one unfavorable refer-

ence? Would you have hired me or would you not have hired me? It is a matter of opinion, really. I can't say that he's not prejudiced; I really can't. But, as far as greeting me and going in his office, he made me feel at home and this type of thing. He talked to me and everything but, when it came to hiring me, this was a different capacity altogether. I mean, he just took a different attitude based on that reference.

(Transcript of hearing at page 18)

Despite this slight change, it seems to me that this additional testimony amounts to little more than a repetition of the charge previously made by her that the District Manager erred in assigning undue weight to the unfavorable report made by the hospital.

The transcript of the hearing was transmitted to the Director of the Equal Opportunity Staff with a report containing the following findings and recommendations:

\* \* \* \* \* \*

2) Mr. Billings, the Manager of the Beckley Social Security Office, was considering hiring Miss Bennett, and told her so. He decided not to after getting what he considered an unfavorable reference from her most recent employer. It appears to me to be a reasonable inference that his eventual decision not to hire her was not motivated by any racial prejudice on his part.

3) Mr. Billings said that it is his normal procedure to check references of all prospective employees. I can see no evidence that Miss Bennett was being unfairly treated by having her references checked before employment.

4) Miss Bennett did not charge, nor is there any indication, that Mr. Billings went out of his way or did anything unusual in asking for a reference from the Beckley Appalachian Regional Hospital, since it was Miss Bennett's most recent employer.

5) It is Mr. Billings' contention that one unfavorable reference is enough, in his mind, to decide not to hire a person, and he cited a previous occasion in which this had occurred and resulted in not hiring a white person. In the hearing I asked Miss Bennett whether she had any information of any contradictory action on the part of Mr. Billings, i. e., an instance in which he hired a white person even though he had an unfavorable reference, and she said she did not.

6) The issue, as I stated in the hearing, is not whether Mr. Billings was wise or unwise in ruling out an applicant on the basis of one negative reference. The issue is whether Mr. Billings did what he did because of Miss Bennett's race.

It is my conclusion, based on the testimony at the hearing, that there is no evidence of racially discriminatory behavior or action on the part of the Beckley Social Security Office.

The facts and findings in the foregoing recitals from the administrative record may be summarized as follows:

(1) The rejection of plaintiff's application for employment was not based on racial discrimination but resulted from an unfavorable report from her former employer, which indicated that she would be an unsuitable employee.

(2) It was the regular and normal practice of the District Office to obtain reports from the former employers of applicants, and the District Manager did not violate any applicable policies or regulations in relying on the unfavorable report.

(3) Plaintiff did not claim or testify that the District Manager was actuated by racial bias in rejecting her application for employment. The substance of her complaint was that the District Manager erred in assigning undue weight to the unfavorable report made by the hospital; that racial discrimination existed at the hospital, and that this racial bias was transmitted to the Department of Health,

Education and Welfare by the unfavorable report. She admitted that she did not know whether Mr. Billings, the District Manager, was aware of the discrimination practiced in the hospital.

If the facts so found were not sufficient to refute the charges of racial discrimination, there remains the overriding fact that the District Manager employed Mrs. Diane Smith, another black person, in the position sought by plaintiff. All of the reports obtained from the references submitted by Mrs. Smith were good, and Mr. Billings decided that she would be a more suitable employee.

It appears to me that the Health, Education and Welfare Equal Opportunity Director totally discounted findings of the special investigator and the hearing officer. Whether or not Mr. Billings was motivated by racial discrimination in denying Mrs. Chambers the position she applied for is a question of fact. Such a determination required an assessment of Mr. Billings' credibility, taking into account not only his testimony but his demeanor. The special investigator and hearing officer both heard the testimony of Mr. Billings and believed his statement that race was not a factor in his decision. The resolution of this dispositive issue turned almost entirely on Mr. Billings' credibility. The Director should have given great weight to the findings of the investigator and hearing officer, but I find no indication that he gave them any weight whatever.

As the Supreme Court said in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951), "[t]he significance of [an examiner's] report, of course, depends largely on the importance of credibility in the particular case." Where credibility is the most important factor, and where *two* examiners independently conclude that a particular witness is telling the truth, how can the reviewer responsibly discount their observations entirely? It is the examiner who "sees the witnesses and hears them testify, while the Board and the reviewing court look only on cold records." National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962).

In addition to the rejection of the findings made by the investigator and the hearing officer, it seems to me that in making his decision, the Director also considered matters that were beyond the scope of the complaint made by plaintiff. The Director correctly stated that the specific charge made by the plaintiff was that discrimination existed at the Beckley Appalachian Regional Hospital and by a reference check by Mr. Billings, it was transferred from one institution to the other. The Director then noted that if no more than that were shown, he would be inclined to conclude that the plaintiff's case was not proven. However, he went on to state that the District Office failed to answer plaintiff's charges "that it operated in and was unduly influenced by an environment of racial discrimination" and that "it offered no data on the racial composition of its office, its hiring practices or implementation of affirmative action."

I have found nothing in the record which indicates that plaintiff made any general complaint about the racial composition of the District Office or its hiring practices. However, Mr. Billings gave the following testimony regarding the employment of Negroes:

DIRECT EXAMINATION OF MR. BILLINGS BY MR. SNYDER:

Q Mr. Billings, have you any objection to the hiring of a qualified negro to work in your office?

A None whatever.

Q Have you in the past hired qualified negroes to work in your office?

A On several occasions; here and elsewhere.

(Transcript of hearing at page 8)

Mr. Billings was also asked by Mr. Snyder, attorney from the Regional Attorney's office, whether he would have employed a white applicant if he had received a similar unfavorable report from a former employer of the applicant. At

pages 9 and 10, the transcript of the hearing shows that Mr. Billings testified as follows:

Q Let me ask you this. If Miss Bennett had been white and you had gone to this depth that you did and received the same information that you did, would you or would you not have hired her?

A I would not have. I can think of a similar illustration where I was right down to the last notch of an individual and it didn't look right to me. I talked with the employer and he gave me all sorts of fine reports and so on and I said, "This doesn't look right. Can I talk with someone else?" And he said, "Well, I'll make an appointment for you to talk with a certain man," and he said, "She's a trouble maker." She was a white girl, I had confidence in recommending her, but she had worked with him.

Q In other words, Miss Bennett's race had nothing to do with this consideration.

A None whatever.

In referring to Mr. Billings' reliance on the unfavorable report submitted by the Beckley Appalachian Regional Hospital, the Director in his decision stated:

Even devoid of racial implications, it would appear unduly arbitrary to give such weight to one unfavorable recommendation, and nullify the preponderance of positive recommendations from other reputable sources as to her character and work.

If this was an important factor in the determination made by the Director, I feel that he must have overlooked the finding of the investigator that the District Manager did not err under existing applicable policies and regulations in assigning substantial and crucial weight to the report made by the hospital. I have seen nothing in the record which shows that the investigator's statement as to the "applicable policies and regulations" was incorrect.

For the reasons stated, I would not adopt the stipulation as a basis for the decision in this case, would hold that the administrative decision is not supported by substantial evidence, and would dismiss plaintiff's petition. In view of my conclusions, I would not reach the legal question as to whether the Tucker Act empowers this court to award plaintiff damages if it is established that there was a violation of Executive Order 11478 in the rejection of her application for employment.

SKELTON, Judge (dissenting):

I respectfully dissent. This court does not have jurisdiction of this case. An analysis of the majority opinion reveals that it has awarded a judgment to the plaintiff on a claim for which no relief can be granted. The court has taken jurisdiction of a claim in which the government is immune from suit as a sovereign and where the Congress has not waived such immunity by giving its consent to be sued. It has rendered an opinion that amounts to a declaratory judgment that the plaintiff is entitled to recover money damages from the government in the sum of approximately $18,000, which is the equivalent of three years' salary of a job which she never held and in which she never performed any services, notwithstanding the fact that no court having equity powers has ever appointed or installed her as an officer or employee of the government in such position and the lack of authority of this court to do so. Accordingly, the claim is not limited to actual, presently due damages from the United States. This court has no power to render a declaratory judgment.

The court has attempted to exercise equity powers by rendering an opinion which in effect appoints the plaintiff to a government job retroactively for a period of three years. This court has no such equity powers.

The appointment of the plaintiff to a a government job retroactively for three years by the court when she was never appointed to the position by the HEW, is an unwarranted and unauthorized assumption and exercise of a discretionary function of an executive agency. The

Supreme Court and all other courts, including this court, have always held that the hiring of employees and appointment of officers involves discretion on the part of an executive agency and is a function reserved exclusively to such agency and will not be interfered with by the courts.

There is no statute of Congress that creates a cause of action against the United States in favor of anyone such as the plaintiff for alleged racial discrimination, and the Congress has never agreed that the government can be sued where one has been denied a government job because of racial discrimination. The HEW regulations and the Presidential Executive Orders relied upon by the plaintiff are of no help to her for at least two reasons. In the first place, such regulations and executive orders do not give the plaintiff a cause of action against the government nor waive the sovereign immunity of the United States from suit in a claim such as that asserted here. In the next place, even if the regulations and executive orders did give the plaintiff a cause of action against the government and waived sovereign immunity against a suit based thereon, this would avail the plaintiff nothing, because no officer or agency of the government can waive the sovereign immunity of the United States against suit. This power is reserved exclusively in the Congress and must be exercised by it by statute which specifically and explicitly waives sovereign immunity. Such waiver cannot be established by implication. There is no specific waiver of immunity by Congress in this case.

The Tucker Act (28 U.S.C. § 1491 (1964)) does not help the plaintiff. As will be shown below, the Tucker Act, which defines the jurisdiction of this court, does not authorize this court or any other court to entertain jurisdiction of a claim based on a non-appointment of a government job because of alleged racial discrimination. The Tucker Act specifically provides that this court does not have jurisdiction of cases sounding in tort, except by consent of the parties. When all the facts are considered in this case, if the plaintiff has any kind of claim at all, it is one sounding in tort. Reduced to its simplest terms, plaintiff complains of an alleged wrongful act of an HEW official, in the exercise of his discretion, whether or not abused, within the scope of his authority and in the discharge of his official duties, in denying her appointment to a government job because of alleged racial discrimination. This is a tort action by statutory definition (28 U.S.C. § 2680(a) (1964), 62 Stat. 984 and amendments), but is one that is barred by sovereign immunity and one that cannot be maintained even in a district court which has general jurisdiction over tort cases.

Finally, in these introductory remarks, I reach the merits of the case, which this court should be vitally interested in from the standpoint of justice and fair dealing. The facts show beyond any question and by clear and convincing evidence and "well nigh irrefragable proof," that there was no racial discrimination in the denial of a government job to the plaintiff in this case. The facts show this, and the trial examiner and the special investigator both so held. The decision of the HEW and the Board of Appeals and Review to the contrary is arbitrary, capricious, and not supported by substantial evidence, and, in fact, not supported by any evidence at all. All the evidence is the other way. The decision of these agencies amounts to nothing more than conclusions of law, not supported by any evidence, and by which this court is not bound.

In view of the foregoing, it is apparent that the court is enlarging its jurisdiction by judicial legislation without authority from Congress. Its judgment in favor of the plaintiff is contrary to the law and the facts and is a complete windfall for her. By its judgment, the court, without Congressional authority, sets itself up as an all-powerful tribunal to police the discretionary acts and functions of executive agencies. In addition, the court is establishing a procedure and system that will be impossible to ad-

minister and enforce. The court's judgment will open the floodgates of litigation to the tens of thousands of applicants for government jobs each year who have been denied employment and who will, without doubt, based on the majority opinion, sue the United States on the grounds of discrimination as to race, creed, color, country of origin, religion, age, and sex. I cannot agree to this kind of a judicial decision. The foregoing will be considered in detail with supporting authorities in the following paragraphs.

I

*The Court Does Not Have Jurisdiction of This Case*

There are many reasons why this court does not have jurisdiction of this case. The majority refers to the plaintiff's suit as one for "back pay." This is a misnomer, as no one is entitled to back pay who has never been appointed to the office and who has not performed any services. The salary of a government position is incident to the job and can only be paid to the person who is appointed to and holds the job and performs its services. Consequently, plaintiff's suit reduced to its basic terms, is simply a claim for damages, not yet due nor established by any court having equity powers, for the alleged wrongful act of an officer of the HEW in denying her employment because of alleged racial discrimination. As will be shown later, this court has no jurisdiction of a case of this kind.

1. *The Plaintiff Has Not Alleged A Cause of Action For Which Relief Can be Granted.*

The plaintiff's case is a simple one and our decision thereon should have been equally simple. She has not alleged a cause of action upon which relief can be granted, and her petition should have been dismissed without oral argument. We need look no further than the cases of Price v. United States, 65 Ct.Cl. 91 (1928), cert. denied, 277 U.S. 587, 48 S. Ct. 434, 72 L.Ed. 1001, and Barea v. Unit-

ed States, 115 Ct.Cl. 44 (1949) for authority for such dismissal. These cases hold that a claim for the recovery of the salary of a government job that does not allege appointment to the job and performance of services therein, does not state a cause of action and must be dismissed. In the *Price* case, the plaintiff sued for the salary of a clerk of a committee of the House of Representatives during a period when another person was appointed to the position instead of the plaintiff by the Clerk of the House. The court dismissed the case, saying:

> We need not indulge citation of authorities to sustain a proposition that no right to recover the salary of an office prevails until the office is created, the salary fixed, *appointment proved, and duties are performed.* * * * [Emphasis supplied.] [*Id.*, 65 Ct.Cl. at 95–96.]

In *Barea*, the court quoted the above holding with approval in dismissing a suit by the plaintiff for the salary of an investigator for the U.S. Un-American Activities Committee who had performed services but had never been appointed to the job by an authorized person, saying:

> * * * The allegations of plaintiff's petition do not state a cause of action. [*Id.*, 115 Ct.Cl. at 46.]

These cases, which are not mentioned by the majority opinion, are unquestionably the law and are decisive against the plaintiff. But we do not have to stop here. The case of Hyman v. United States, 157 F.Supp. 164, 138 Ct.Cl. 836 (1957), is squarely against the plaintiff. That case is similar to the case before us, except for the allegations of racial discrimination here. There the plaintiff had "priority rights" to be appointed to a job which became available, but the agency did not hire her. She sued for the salary of the job retroactive to the date she claimed she should have been hired (the same as here). The court ruled against her, saying:

> * * * A Government employee with reemployment *priority rights* is merely a "former" Government employee

who has certain preference or priority rights which he may assert *when a position becomes vacant for which he qualifies. * * *

* * * Because of her reemployment *priority* rights, plaintiff merely had a right to priority in securing a job in the Housing Administration. * * * [*W*]*e know of no authority on which might be based a decision that she is entitled to be paid for a job to which she was not appointed and from which she was not, of necessity, removed.* [Emphasis supplied.]

Plaintiff's motion for summary judgment is overruled and her petition is dismissed. Defendant's motion for summary judgment is granted. [*Id.* 157 F.Supp. at 168, 138 Ct.Cl. at 842.]

The majority, finding the *Hyman* case an obstacle to plaintiff's recovery here, peremptorily overruled it without citing any authority for doing so. The court committed error in taking this action regarding a case that was not only sound and correct, but also had been the law for many years, especially with no reason given except the caprice of the court. The *Price* and *Barea* cases have not been overruled by the court and are controlling against the plaintiff. They announced the law in this field more than forty years ago.

The failure of the plaintiff to state a cause of action on which relief can be granted is so academic and obvious that, as this court said in the *Price* case, *supra.* "We need not indulge citation of authorities to sustain a proposition that no right to recover the salary of an office prevails until * * * appointment [is] proved, and duties are performed." That is the situation in the case before us.

2. *The Plaintiff Had No Constitutional, Inherent or Vested Right to a Government Job, and the Denial Thereof Did not Give Her a Cause of Action Against the United States.*

The plaintiff has filed this suit for damages because of her non-appointment to a government job, apparently on the theory that she was denied a job to which she was entitled. She could not be more mistaken, because no person has a constitutional, inherent or vested right to a government job. Many cases have so held. Mr. Justice Holmes made an historic decision in this regard in McAuliffe v. New Bedford, 155 Mass. 216, 29 N.E. 517 (1892) when he said:

* * * The petitioner may have a constitutional right to talk politics, *but he has no constitutional right to be a policeman.* [*Id.* 29 N.E. at 517.] [Emphasis supplied.]

Many cases have made similar rulings. In Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965), the court said:

* * * Plaintiff, however, has no right to public employment. * * * [*Id.* at 828.]

Again, at page 828, the court in that case said:

Thus the Constitution protects the right of free speech but it does not guarantee plaintiff employment with the City of Minneapolis. * * *

In Bailey v. Richardson, 86 U.S.App. D.C. 248, 182 F.2d 46 (1950), aff'd 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951), the court said:

* * * The First Amendment guarantees free speech and assembly, but it does not guarantee Government employ. * * * [*Id.* 182 F.2d at 59.]

* * * *But there is no basic right to Government employ,* any more than there is to employment by any other particular employer. * * * [Emphasis supplied.] [*Id.* 182 F.2d at 60.]

* * * *Government employ,* with which we are here dealing, *is not a right.* * * * What is denied her [the plaintiff] is Government employ. The argument * * * therefore, must me that Miss Bailey has a right to Government employ unless her presence there would constitute a clear and present danger. *There simply is no such right.* * * * [Emphasis supplied.] [*Id.* 182 F.2d at 61.]

The reason for these court decisions, and others like them, is better understood when we consider the nature of a government job.

Article 2, Section 2, of the Constitution provides in pertinent part:

\* \* \* [T]he Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

No citation of authority is needed to show that the HEW job involved here was a position which the head of that department had been authorized to fill in accordance with the above provision of the Constitution. An appointment by him or by his authority was the only way the position could be filled. This is fundamental, as was stated by the Supreme Court in United States v. Smith, 124 U.S. 525, 8 S.Ct. 595, 31 L.Ed. 534 (1888):

\* \* \* An officer of the United States can only be appointed by the president, by and with the advice and consent of the Senate, or by a court of law, or the head of a department. A person in the service of the government who does not derive his position from one of these sources is not an officer of the United States in the sense of the Constitution. This subject was considered and determined in United States v. Germaine, 99 U.S. 508, and in the recent case of United States v. Mouat, [124 U.S.] 303, [88 S.Ct. 505]. What we have here said is but a repetition of what was there authoritatively declared. [*Id.* at 532, 8 S.Ct. at 597]

Again, in United States v. Mouat, 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463 (1888), the court said:

\* \* \* Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States.

We do not see any reason to review this well established definition of what it is that constitutes such an officer. [*Id.* at 307, 8 S.Ct. at 506]

In Thomason v. United States, 85 F. Supp. 742, 743 (N.D.Cal.1948), aff'd 184 F.2d 105 (9th Cir. 1950), the court said:

\* \* \* The United States Supreme Court and inferior Federal Courts have frequently been called upon to decide who are "officers of the United States." The test used in the great majority of the cases is: Was the employee appointed by the "head of a department" or by one to whom the power of appointment has been delegated by the "head of a department"? United States v. Germaine, 1878, 99 U.S. 508, 25 L.Ed. 482; United States v. Mouat, 1888, 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463; Burnap v. United States, 1920, 252 U.S. 512, 40 S.Ct. 374, 64 L.Ed. 692; Scully v. United States, C.C., 193 F. 185; Morrison v. United States, D.C., 40 F.2d 286; Hoeppel v. United States, 66 App.D.C. 71, 85 F.2 237; Brooks v. United States, D.C., 33 F.Supp. 68.

What, then is, the the nature of a government job? In United States v. Hartwell, 73 U.S. (6 Wall.) 385, 18 L.Ed. 830 (1867) the Supreme Court held:

An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

\* \* \* \* \* \*

A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other.†

† United States v. Maurice [Fed.Cas.No. 15,747], 2 Brockenbrough [96] 103; Jackson v. Healy, 20 Johnson [N.Y.] 493 [495]; Vaughn v. English, 8 California, 39; Sanford v. Boyd [Fed.Cas. No.12,311], 2 Cranch's Circuit Court, 78; Ex parte Smith [Fed.Cas.No. 12,967], Id. 693. [*Id.* at 393.]

In commenting on the above holding in the *Hartwell* case, the court in Baskins v. United States, 32 F.Supp. 518, 519 (E.D.S.C.1940), said:

In connection with this section of the Constitution the Supreme Court of the United States in the case of United States v. Hartwell, 1867, 6 Wall. 385, 73 U.S. 385, 18 L.Ed. 830, construed the term office to mean a public station or employment conferred by the appointment of government. The term embraces the ideas of tenure duration, emolument and duties. The court in this case, further held that the defendant, Hartwell, having been appointed by the head of his department within the meaning of the applicable constitutional provision upon the subject of the appointing power (Section 2, Article 2, Constitution) was an officer of the United States. See, also, United States v. Germaine, 1878, 99 U.S. 508, 25 L.Ed. 482; also Hall v. Wisconsin, 1880, 103 U.S. 5, 26 L.Ed. 302; also, Auffmordt v. Hedden, 1890, 137 U.S. 310, 11 S.Ct. 103, 34 L.Ed. 674; Fairchild v. United States, C.C.N.J., 1899, 91 F. 297; also United States v. McCrory, 5 Cir., 1899, 91 F. 295, citing with approval the Hartwell and Germaine cases, supra.

In Crenshaw v. United States, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825 (1890), the Supreme Court held that even after appointment, a public officer had no vested or contract right in his office. The court said:

The primary question in this case, one which underlies the first, second and third of appellant's propositions stated above, is, whether an officer appointed for a definite time or during good behavior had any vested interest or contract right in his office of which Congress could not deprive him? The question is not novel. There seems to be but little difficulty in deciding that there was no such interest or right. * * * [*Id.* at 104, 10 S.Ct. at 432.]

The court in that case said further:

* * * We have already shown, that the appointment to and the tenure of an office created for the public use, and the regulation of the salary affixed to such an office, do not fall within the meaning of the section of the Constitution relied on by the plaintiffs in error; do not come within the import of the term *contracts*, or, in other words, the vested, private personal rights thereby intended to be protected. * * * [*Id.* at 105, 10 S.Ct. at 433.]

 * * * * * *

* * * Whatever the form of the statute, the officer under it does not hold by contract. He enjoys a privilege revocable by the sovereignty at will; and one legislature cannot deprive its successor of the power of revocation. Butler v. Pennsylvania, *supra* [10 How. 402, 13 L.Ed. 472]; Stone v. Mississippi, *supra* [101 U.S. 814, 25 L.Ed. 1079]; Cooley's Const. Lim. 283; United States v. McDonald, 128 U.S. 471, 473, [9 S.Ct.Rep. 117]. [*Id.* at 108, 10 S.Ct. at 434.]

Again, in Taylor v. Beckham, 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900), the Supreme Court wrote on this subject as follows:

The view that public office is not property has been generally entertained in this country.

 * * * * * *

In Crenshaw v. United States, 134 U.S. 99, 104 [10 S.Ct. 431, 432, 33 L.Ed. 825, 827], Mr. Justice Lamar stated the primary question in the case to be: "Whether an officer appointed for a definite time or during good behavior had any vested interest or contract right in his office of which Congress could not deprive him." And he said, speaking for the court: "The question is not novel. There seems to be but little difficulty in deciding that there was no such interest or right." Butler v. Pennsylvania, *supra*; Newton v. Commissioners, 100 U.S. 548 [25 L.Ed. 710]; Blake v. United States, 103 U.S. 227

[26 L.Ed. 462]; and many other cases.

The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. * * * In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right. [*Id.* at 576–577, 20 S.Ct. at 900.]

In Urbina v. United States, 428 F.2d 1280, 1284, 192 Ct.Cl. 875, 881 (1970), we held:

* * * If, * * * plaintiff's reliance is on some theory of contract. law, his position would not be improved since it is plain that public employment does not, in a situation such as is here involved, give rise to a contractual relationship in the conventional sense. Borak v. United States, 78 F.Supp. 123, 110 Ct.Cl. 236, cert. denied, 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375 (1948). Cf. Lawrenson v. United States, 153 F.Supp. 790, 139 Ct.Cl. 370 (1957) * * *.

In Bailey v. Richardson, 86 U.S.App. D.C. 248, 182 F.2d 46 (1950), aff'd, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951), the court said:

* * * If her status was merely that of an *applicant for appointment*, as we think it was, her nonappointment involved no procedural constitutional rights. Obviously, an *applicant for office* has no constitutional right to a hearing or a specification of the reasons why he is not appointed. * * * [Emphasis supplied.] [*Id.* 182 F.2d at 55.]

The court in that case held that government employ was neither property nor a contract and the due process clause of the Constitution does not apply, saying:

* * * The due process clause provides: "No person shall * * * be deprived of life, liberty, or property, without due process of law; * * *." It has been held repeatedly and consistently that Government employ is not "property" and that in this particular it is not a contract. We are unable to perceive how it could be held to be "liberty". Certainly it is not "life". So much that is clear would seem to dispose of the point. In terms the due process clause does not apply to the holding of a Government office. [Id. 182 F.2d at 57.]

This holding in the *Bailey* case was quoted with approval in the case of Jenson v. Olson, 353 F.2d 825, 828 (8th Cir. 1965), when it said:

On the issue of whether plaintiff was deprived of due process of law, the Court of Appeals for the District of Columbia in Bailey v. Richardson, supra, 182 F.2d at page 57 had this to say:

"It has been held repeatedly and consistently that Government employ is not 'property' * * * the due process clause does not apply to the holding of a Government office." [*Id.* at 828.]

Other attributes and characteristics of a government job that should be noted are that the salary is incident to and a part of the job. Also, the salary is payable *only* to the person who is appointed to the job and holds the office, and, conversely, a government employee is entitled only to the salary of the position to which he has been appointed.

In Borak v. United States, 78 F.Supp. 123, 110 Ct.Cl. 236, cert. denied, 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375 (1948), this court said:

He was not working under a contract with a fixed time limit on the holding of the office. He held a public office with tenure, duties, and compensation established by law. *The salary was an incident of the office and as this Court has repeatedly held, is payable not to those who do the work but to those who hold the office.* Jacobs v. United States, 41 Ct.Cl. 452; Whiting v. United States, 35 Ct.Cl.

291, 301; Miller v. United States, 86 Ct.Cl. 609; Coleman v. United States, 100 Ct.Cl. 41. [Emphasis supplied.] [*Id.* 78 F.Supp. at 125, 110 Ct.Cl. at 247.]

The court also said in that case:

* * * This Court has also said, "salaries fixed by Congress are the salaries payable to those who hold the office and not to those who perform the duties of the office." Coleman v. United States, 100 Ct.Cl. 41, reaffirmed, Dvorkin v. United States, 101 Ct.Cl. 296.

&ast; &ast; &ast; &ast; &ast; &ast;

This is not an action for damages but an action by the holder of the office for the salary attaching thereto. * * * [*Id.* 78 F.Supp. at 124, 110 Ct.Cl. at 246.]

This court held in Price v. United States, 80 F.Supp. 542, 543, 112 Ct.Cl. 198, 200 (1948):

It is a well-settled principle of law that federal government employees are entitled only to the salaries of the position to which they are appointed regardless of the duties they actually perform. That rule of law was reaffirmed in the case of Coleman v. United States, 100 Ct.Cl. 41, and Dvorkin v. United States, 101 Ct.Cl. 296, certiorari denied 323 U.S. 730, 65 S.Ct. 66, 89 L. Ed. 586.

&ast; &ast; &ast; &ast; &ast; &ast;

* * * [But] The salaries fixed by Congress are the salaries payable to those who hold the office and not to those who perform the duties of the office. * * *

&ast; &ast; &ast; &ast; &ast; &ast;

And in the *Dvorkin* case involving the same issues, it was held that *the determinative test of a person's right to salary is not the duties performed, but the position or grade to which he was appointed.* [*Id.* 80 F.Supp. at 543, 112 Ct.Cl. at 200–201.] [Emphasis supplied.]

These principles were again stated by this court in Ganse v. United States, 376

F.2d 900, 902, 180 Ct.Cl. 183, 186 (1967), when the court said:

* * * It is a well-settled principle of law that Federal Government employees are entitled only to the salaries of positions to which they are appointed, regardless of the duties they actually perform. Price v. United States, 80 F.Supp. 542, 543, 112 Ct.Cl. 198, 200 (1948) and cases cited. * * *

*See, also* United States v. McLean, 95 U. S. 750, 24 L.Ed. 579 (1877); Coleman v. United States, 100 Ct.Cl. 41 (1943); Amundson v. United States, 120 F.Supp. 201, 128 Ct.Cl. 80 (1954); and Dvorkin v. United States, 101 Ct.Cl. 296, cert. denied, 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586 (1944).

The majority mentions some of these cases and the principles established by them, but brushes them aside by saying they involved cases where employees were appointed to one position but were claiming salaries of a higher paid position to which they had not been appointed. This is a distinction without a reason. There is no difference between those cases and the one before us. In all of them (including the plaintiff here) the claimants were demanding the salary of positions to which they had never been appointed and which they had never held. The foregoing principles apply to all of these cases including the case at bar.

We can conclude from the authorities cited above that a government job is not property, does not involve contract rights, but does include, tenure, salary and duties. It can only be conferred by appointment as authorized by Congress. Unless a person has been so appointed, he is not in the government employ and is not a public officer. No one has a constitutional or vested right to a government job, and the due process clause of the Constitution does not apply to it. The denial of appointment to a government job violates no provision of the Constitution nor any private, personal, or vested right of the applicant. The salary of a government job is not property secured by contract, but compensation appropriated by Congress for services ac-

tually rendered. Salary is incident to and a part of the job and is payable only to the person who has been appointed to the position and holds the office. The determinative test of a person's right to salary is the position to which he has been appointed. See the *Dvorkin* case, *supra*. If he has not been appointed, he is not entitled to the salary which is incident to and which attaches to the job.

When the plaintiff's case is tested by these principles and these requirements, it is clear that she has not alleged a cause of action, and her petition should be dismissed.

*3. The Appointment of the Plaintiff to a Government Job by the Court is an Unwarranted and Unauthorized Interference with and Usurpation of the Discretionary Function of an Executive Agency*

Although the majority opinion states that it is not appointing the plaintiff to a government job, the reverse is true as a matter of fact. I have shown above that the salary is incident to and a part of a government job, and that no one is entitled to be paid such salary unless he has been appointed to the job by an authorized person or agency. Here, the court is awarding the plaintiff the salary of this job for three years, retroactively, which cannot be done unless she is being appointed to the job for such period of time. There is no other way she could be paid such salary. The HEW has not appointed her. It follows that the court is doing so. This is completely beyond the power of this court.

It has always been held by the Supreme Court and all other courts, including the Court of Claims, that the appointment of government employees is an executive agency function. Actually, Article 2, Section 2 of the Constitution (quoted above) so provides. The courts have held repeatedly that this function involves discretion on the part of the agency and will not be interfered with by the courts. This is so fundamental that citation of authority to support it should be unnecessary. However, since the majority opinion ig-

nores the rule, citation of authority becomes necessary.

In 1839 the Supreme Court said in the case of Ex parte Hennen, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138 (1839):

\* \* \* If the power to appoint a clerk was vested exclusively in the District Court, and the office was held at the discretion of the Court, as we think it was; then this Court can have no control over the appointment or removal, or entertain any inquiry into the grounds of removal. If the judge is chargeable with any abuse of his power, this is not the tribunal to which he is amenable: and as we have no right to judge upon this matter, or power to afford redress if any is required, we abstain from expressing any opinion upon that part of the case. [*Id.* at 261–262.]

Again, in 1840, the Supreme Court held in Decatur v. Paulding, 39 U.S. (14 Pet.) 497, 10 L.Ed. 559 (1840):

\* \* \* The Court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion, or judgment. Nor can it by mandamus, act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties. [*Id.* at 515.]

\* \* \* \* \* \*

The interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them. \* \* \* [*Id.* at 516.]

In United States v. McLean, 95 U.S. 750, 24 L.Ed. 579 (1877), the Supreme Court said:

\* \* \* But courts cannot perform executive duties, or treat them as performed when they have been neglected. They cannot enforce rights which are dependent for their existence upon a

prior performance by an executive officer of certain duties he has failed to perform. The right asserted by the claimant rests upon a condition unfulfilled. The judgment was therefore erroneous, and must be reversed, and the record remitted to the Court of Claims, with instructions to dismiss the petition; * * *. [*Id.* at 753.]

The Supreme Court cited the decision in Decatur v. Paulding, *supra*, with approval in the case of Keim v. United States, 177 U.S. 290, 20 S.Ct. 574, 44 L. Ed. 774 (1900), which was an appeal from a Court of Claims decision (33 Ct. Cl. 174 (1898)), as follows:

It has been repeatedly adjudged that the courts have no general supervising power over the proceedings and action of the various administrative departments of government. Thus, in Decatur v. Paulding, 14 Pet. 497, 515, 10 L.Ed. 559, in which was presented the question of the right of the Circuit Court of the District of Columbia to issue a writ of mandamus to the Secretary of the Navy to perform an executive act not merely ministerial but involving the exercise of judgment, it was said by Chief Justice Taney:

"The court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment. Nor can it by mandamus act directly upon the officer and guide and control his judgment or discretion in the matters committed to his care in the ordinary discharge of his official duties. * * * The interference of the courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them."

The same proposition was reaffirmed in United States ex rel. Dunlap v. Black, 128 U.S. 40 [9 S.Ct. 12, 32 L.Ed. 354], in an elaborate opinion by Mr. Justice Bradley. See also United States ex rel. Redfield v. Windom, 137 U.S. 636 [11 S.Ct. 197, 34 L.Ed. 811]; Boynton v. Blaine, 139 U.S. 306 [11 S.Ct. 607, 35 L.Ed. 183]. * * * [*Id.* 177 U.S. at 292–293, 20 S.Ct. at 575.]

The Supreme Court then proceeded to set forth the correct rule as follows:

The appointment to an official position in the Government, even if it be simply a clerical position, is not a mere ministerial act, but one involving the exercise of judgment. The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position. Therefore it is one of those acts over which the courts have no general supervising power. [*Id.* at 293, 20 S.Ct. at 575.]

We followed the *Keim* case in Donnelly v. United States, 134 F.Supp. 635, 133 Ct.Cl. 120 (1955), when we said:

* * * Appointment is an executive function, involving the exercise of executive discretion. Keim v. United States, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774. This court cannot exercise this function and in the absence of actual appointment, or facts equivalent thereto, we cannot award Plaintiff Donnelly compensation as commissaryman, chief. United States v. McLean, 95 U.S. 750, 753, 24 L.Ed. 579; Amundson v. United States, 120 F.Supp. 201, 128 Ct.Cl. 80; Coleman v. United States, 100 Ct.Cl. 41 [*Id.* 134 F.Supp. at 636, 133 Ct.Cl. at 122.]

In Tierney v. United States, 168 Ct.Cl. 77 (1964), we said:

* * * The power of appointment is within the discretion of the head of a department. It is an executive function which involves exercising the discretion of the executive. Keim v. United States, 177 U.S. 290 [20 S.Ct. 574, 44 L.Ed. 774] (1900); Amundson v. United States, 128 Ct.Cl. 80, 120 F. Supp. 201 (1954); Donnelly v. United States, 133 Ct.Cl. 120, 134 F.Supp. 635 (1955); Goldstein v. United States, 131 Ct.Cl. 228, 130 F.Supp. 330 (1955),

cert. denied 350 U.S. 888 [76 S.Ct. 143, 100 L.Ed. 782] (1955). If this court were to grant recovery to plaintiff it would in effect bestow upon plaintiff a promotion which he never received. In so doing, this court would be making an administrative decision. Such action would be a clear usurpation by the judiciary of an administrative function. * * * [*Id.* at 80.]

The majority opinion noted the above quotation from the *Tierney* case and then failed to follow it.

In Powell v. Brannan, 91 U.S.App.D.C. 16, 196 F.2d 871 (1952) the court held:

We think it well to reiterate that in civil service cases the task of the courts is a limited one. Certainly they cannot undertake to pass on a plaintiff's qualifications for any given post, or to compare them with those of an incumbent. *It is not within their province to weigh the merits of a person's claim to a Federal job.* Congress has established administrative machinery to make these determinations. [Emphasis supplied.] [*Id.* 196 F.2d at 873.]

The court said in Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965), citing Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46 (1950):

No function is more completely internal to a branch of government than the selection and retention or dismissal of its employees. * * * [*Id.* 353 F.2d at 829.]

We said in Bortin v. United States, 138 F.Supp. 251, 133 Ct.Cl. 856 (1956):

* * * It would be quite detrimental to the public service if an agency head had no discretion in selecting men to do important jobs. He is already circumscribed more than a little in his control over his subordinates. Further restraint upon him would be unwise. [*Id.* 138 F.Supp. at 253, 133 Ct.Cl. at 860.]

We can conclude from these decisions that the appointment of a person to a government job, even if to a simple clerk's job (as the Supreme Court said

in the *Keim* case), is an executive function involving the exercise of executive function. As we said in the *Donnelly* case, "This court cannot exercise this function and in the absence of actual appointment, * * * we cannot award [the] Plaintiff * * * compensation [salary of a named job]. [*Id.* 134 F. Supp. at 636, 133 Ct.Cl. at 122.]

Accordingly, the appointment of the plaintiff to an HEW job by the court and awarding her the salary of the job retroactively for three years is completely beyond the power of this court. We do not have jurisdiction to entertain a claim of this kind. The plaintiff's suit should be dismissed.

*4. The Appointment of Plaintiff to a Government Job by the Court is an Attempt by the Court to Exercise Equitable Powers it does not Possess.*

No citation of authority is necessary for the proposition that the Court of Claims has not been invested with general equity powers by the Congress. It has no authority to take jurisdiction in a purely equitable proceeding. It cannot issue a mandamus or an injunction nor render a declaratory judgment in a suit brought for that purpose. It cannot restore a discharged government employee to his job even if he has been fired illegally. This was the decision of this court in Casman v. United States, 135 Ct.Cl. 647 (1956), when we said:

* * * [T]he Court of Claims is without jurisdiction to restore plaintiff to his position. Ora Erskine Gaines v. United States [131 F.Supp. 925], 132 C.Cls. 408. [*Id.* at 650.]

Since this court has no general equity powers and does not have jurisdiction to restore an illegally discharged government employee to his job, how can it appoint the plaintiff to a job she never held? Where does it get jurisdiction to exercise such equitable powers?

We do not have to look far to find the answers to these questions. They are fully stated in the recent case of United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). In that case, the

plaintiff was retired from the Army for longevity. He contended that he should have been retired for disability. In the latter case, he would have been exempt from income taxation. He sought and obtained a declaratory judgment in his favor in the Court of Claims. The Supreme Court reversed the decision, saying this court did not have equitable powers to render a declaratory judgment. The decision of the Supreme Court should be dispositive of the plaintiff's case here. It held:

> The Court of Claims was established by Congress in 1855. Throughout its entire history up until the time that this case was filed, its jurisdiction has been limited to money claims against the United States Government. In 1868 this Court held that "the only judgments which the Court of Claims [is] authorized to render against the government * * * are judgments for money found due from the government to the petitioner." United States v. Alire, 6 Wall. 573, 575 [18 L.Ed. 947]. In United States v. Jones, 131 U.S. 1 [9 S.Ct. 669, 33 L.Ed. 90]; this Court reaffirmed this view of the limited jurisdiction of the Court of Claims, and held that *the passage of the Tucker Act in 1887 had not expanded that jurisdiction to equitable matters.* More recently, in 1962, it was said in the prevailing opinion in Glidden Co. v. Zdanok, 370 U.S. 530, 557 [82 S.Ct. 1459, 1476, 8 L.Ed.2d 671], on a point not disputed by any of the other members of the Court that "[f]rom the beginning [the Court of Claims] has been given jurisdiction only to award damages * * *." No amendment purporting to increase the jurisdiction of the Court of Claims has been enacted since the decision in *Zdanok*.

The foregoing cases decided by this Court therefore clearly show that neither the Act creating the Court of Claims nor any amendment to it grants that court jurisdiction of this present case. That is true because Colonel King's claim is not limited to actual,

presently due money damages from the United States. Before he is entitled to such a judgment he must establish in some court that his retirement by the Secretary of the Army for longevity was legally wrong and that he is entitled to a declaration of his right to have his military records changed to show that he was retired for disability. *This is essentially equitable relief of a kind that the Court of Claims has held throughout its history, up to the time this present case was decided, that it does not have the power to grant.* [*Id.* at 2–3, 89 S.Ct. at 1502.]

As can be seen from the *King* decision, the Supreme Court held in plain and unequivocal language that this court cannot exercise equity powers. Yet the court is doing so in appointing the plaintiff to a government job, notwithstanding the *King* decision.

It is important to note that in the *King* case, the Supreme Court not only held that this court did not have equitable powers, but also that it did not have jurisdiction of plaintiff's claim in that case because it "[was] not limited to actual, presently due money damages from the United States." The Supreme Court went on to say that before plaintiff King is entitled to a judgment he must establish in some court (other than the Court of Claims) that his retirement for longevity was legally wrong and that he is entitled to a declaration (declaratory judgment) of his right to have his military records changed to show that he was retired for disability. The Court then said that this was equitable relief which the Court of Claims did not have the power to grant. This part of the *King* decision is particularly significant when applied to the case before us. If so applied, it would mean that this court does not have jurisdiction of plaintiff's claim in the present case "because * * * it is not limited to actual, presently due money damages from the United States." No court having jurisdiction has determined that the plaintiff is entitled to any money damages nor the amount thereof, if any. No court hav-

ing jurisdiction has decided that any money damages are presently due to plaintiff from the United States. These determinations must be made in some other court before the plaintiff can sue the United States for money damages in this court. In other words, applying the *King* decision further to our case, before the plaintiff here would be entitled to a judgment for money damages against the United States, she would have to "establish in some court" (other than the Court of Claims) that she was entitled to be appointed to the government job in question and obtain a "declaration of her right" to the job. This is equitable relief that the Supreme Court held the Court of Claims does not have the power to grant. Since these prerequisites have not been met, this court does not have jurisdiction of the plaintiff's case.

Under these circumstances, the decision of the majority that the plaintiff was wrongfully denied a government job to which she was entitled and that by reason thereof she is entitled to money damages from the United States, is a declaratory judgment of her rights which is equitable relief beyond the power of this court to grant, as stated above.

5. *This Court Lacks Jurisdiction of Plaintiff's Suit Because of the Sovereign Immunity From Suit of the United States, which has not been Waived by an Act of Congress.*

It is fundamental that the United States as a sovereign cannot be sued without its consent. This consent can only be given by the Congress. The consent must be embodied in an Act of Congress and must be specific and explicit and cannot be implied by construction of an ambiguous statute. The waiver of sovereign immunity must be contained in an express enactment of Congress. No officer of the United States can give consent for the government to be sued nor waive its sovereign immunity from suit. If these prerequisites are not complied with, the court lacks jurisdiction to entertain the suit.

In the case of United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940), the Supreme Court held:

* * * [W]ithout *specific* statutory consent, no suit may be brought against the United States. *No officer by his action can confer jurisdiction.* [Emphasis supplied.] [*Id.* at 500–501, 60 S.Ct. at 661.]

The Supreme Court confirmed the holding of the *Shaw* case on both points quoted above in its decision in United States v. U. S. Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), and held further:

* * * Absent that consent, the attempted exercise of judicial power is void. * * * [*Id.* at 514, 60 S.Ct. at 657.]

In Nassau Smelting & Refining Works v. United States, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190 (1924), the Supreme Court held:

* * * The objection to a suit against the United States is fundamental, whether it be in the form of an original action or a set-off or a counterclaim. Jurisdiction in either case does not exist unless there is *specific congressional authority* for it. * * * [*Id.* at 106, 45 S.Ct. at 25.] [Emphasis supplied.]

Again, in United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), the Supreme Court said:

The United States, as sovereign, is immune from suit save as it consents to be sued, United States v. Thompson, 98 U.S. 486 [25 L.Ed. 194]; United States v. Lee, 106 U.S. 196 [1 S.Ct. 240, 27 L.Ed. 171]; Kansas v. United States, 204 U.S. 331 [27 S.Ct. 388, 51 L.Ed. 510]; Minnesota v. United States, 305 U.S. 382, 387 [59 S.Ct. 292, 294, 83 L.Ed. 235]; Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388 [59 S.Ct. 516, 517, 83 L. Ed. 784]; United States v. Shaw, 309 U.S. 495 [60 S.Ct. 659, 84 L.Ed. 888] (see cases cited in The Pesaro, [D.C.] 277 F. 473, 474, et seq.), and the terms

of its consent to be sued in any court define that court's jurisdiction to entertain the suit. Minnesota v. United States, supra, [305 U.S.] 388 [59 S.Ct. 295, 83 L.Ed. 235] and cases cited; cf. Stanley v. Schwalby, 162 U.S. 255, 270 [16 S.Ct. 754, 760, 40 L.Ed. 960]. [*Id.* at 586–587, 61 S.Ct. at 769.]

\* \* \* \* \* \*

Except as Congress has consented there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States, or for the review of its decisions by appellate courts. Luckenbach Steamship Co. v. United States, 272 U.S. 533, 536 [47 S.Ct. 186, 187, 71 L.Ed. 394], et seq. \* \* \* [*Id.* at 587–588, 61 S.Ct. at 770.]

The plaintiff's suit does not meet any of these requirements. The only statute that is in any way related to her claim is 5 U.S.C. § 7151, Supp. V. (1965–1969) which provides:

§ 7151. Policy.

It is the policy of the United States to insure equal employment opportunities for employees without discrimination because of race, color, religion, sex, or national origin. The President shall use his existing authority to carry out this policy.

We look in vain for any waiver of sovereign immunity from suit or consent to be sued in this statute if the policy set forth in the statute is violated. The statute shows on its face that it does not vest any legally enforceable rights in the plaintiff, nor create a cause of action in her favor, nor waive immunity from suit. The most that could be said of the statute, if it created any rights in the plaintiff, is that it limited her to *administrative* remedies. This is clearly within the power and discretion of Congress. The Supreme Court pointed this out in the case of Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), when it said:

\* \* \* When the United States creates rights in individuals against itself, it is under no obligation to pro-

vide a remedy through the courts. United States v. Babcock, 250 U.S. 328, 331 [39 S.Ct. 464, 63 L.Ed. 1011]. It may limit the individual to administrative remedies. Tutun v. United States, 270 U.S. 568, 576 [46 S.Ct. 425, 70 L.Ed. 738]. \* \* \* [*Id.* at 582, 54 S.Ct. at 845.]

In the present case, the plaintiff asked for and obtained an administrative remedy. She was given a job through the administrative process. That was more than she was entitled to, inasmuch as the facts show that there was no racial discrimination in the case. However, her entitlement to the job that was created for her by the administrative agency is not before us, except that it shows that she received administrative relief under the statute. The plain meaning of the Act shows that Congress never intended that she could receive more than that.

The majority opinion attempts to avoid the long-established rule that sovereign immunity from suit and consent to be sued can only be granted by a specific and explicit Act of Congress by implication in its construction of the statute (5 U.S.C. § 7151) quoted above. The majority opinion states in this regard:

\* \* \* Congress indicated its intent that 5 U.S.C. § 7151, *supra*, be more than merely hortatory when it instructed the President to "use his existing authority to carry out this policy" of equal employment opportunity. \* \* \* When it [the Congress] desires to exclude a class of claim from judicial review it knows how to do so. \* \* \* But absent such a clear manifestation that access to the courts is prohibited where a specific right has been created, we think it is the intent of Congress that the general jurisdictional statutes are controlling.

\* \* \*

In other words, the majority opinion is saying that since 5 U.S.C. § 7151 does not prohibit anyone complaining of a violation of the non-discrimination poli-

cy of the Act from suing the United States in court, the consent of the government to be sued is established by *implication*. This is not the law. It is the identical argument that was rejected by the Supreme Court in the recent case of United States v. King, *supra*. It will be recalled that in that case the plaintiff was suing for a declaratory judgment in the Court of Claims. We held that we had jurisdiction to render a declaratory judgment under the terms of the Declaratory Judgment Act, 28 U.S. C. § 2201 (1964), which provides:

§ 2201. Creation of remedy.

In a case of actual controversy within its jurisdiction, * * * any court of the United States * * * may declare the rights and other legal relations of any interested party seeking such declaration, * * *.

The Supreme Court held we had no such jurisdiction, saying:

* * * For the court below, it was sufficient that there was no clear indication that Congress affirmatively intended to exclude the Court of Claims from the scope of the Declaratory Judgment Act. We think that this approach runs counter to the settled propositions that the Court of Claims' jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that *such a waiver cannot be implied but must be unequivocally expressed.* United States v. Sherwood, 312 U.S. 584 [61 S.Ct. 767, 85 L.Ed. 1058]. [Emphasis supplied.] [United States v. King, 395 U.S. at 4, 89 S.Ct. at 1502.]

As can be seen from the above, the Supreme Court rejected the argument that by implication the Court of Claims could issue a declaratory judgment since the Declaratory Judgment Act did not affirmatively exclude it. This is precisely the position taken by the majority in this case. The *King* case is squarely against the majority opinion in this regard.

Many cases have held that the waiver of sovereign immunity cannot be implied but must be unequivocally expressed. In General Mut. Ins. Co. v. United States, 119 F.Supp. 352 (N.D.N.Y.1953), the court said:

It is beyond argument that the United States may be sued only where its immunity has been specifically waived by statute, and that *such waiver may not be implied in the construction of an ambiguous statute.* [*Id.* at 354.] [Emphasis supplied.]

In Leyerly v. United States, 162 F.2d 79 (10th Cir. 1947), the court held:

*The government does not consent to be sued by implication,* and consent to be sued should not be extended beyond the plain terms of the authorizing statute. Price v. United States and Osage Indians, 174 U.S. 373, 19 S.Ct. 765, 43 L.Ed. 1011; Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472; * * *. [Emphasis supplied.] [*Id.* at 84.]

In the case of North Dakota-Montana Wheat Growers' Ass'n v. United States, 66 F.2d 573 (8th Cir. 1933), the court said:

It is fundamental that the United States cannot be sued without its permission, and that permission must be specifically granted by Congress. *It will not be implied.* It is a deep-rooted principle in the fabric of all English speaking countries that a sovereign is immune from suits in its own courts. In Nassau Smelting & Refining Works, Ltd. v. United States, 266 U.S. 101, 106, 45 S.Ct. 25, 69 L.Ed. 190, the court said: "The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a setoff, or a counterclaim. Jurisdiction in either case does not exist, unless there is specific congressional authority for it. * * * [Emphasis supplied.] [*Id.* at 577.]

It follows that since no express waiver of sovereign immunity from suit was

contained in 5 U.S.C. § 7151, *supra*, this court has no jurisdiction of plaintiff's suit based on such waiver by implication as stated in the majority opinion.

I now reach the question of whether or not Executive Order 11478 and the HEW regulations based thereon (which in turn are necessarily based on 5 U.S.C. § 7151), and which set forth a policy of non-discrimination in government employment, constitute a waiver of sovereign immunity from suit of the United States. I have already shown that such a waiver of immunity can only be given by an express enactment of Congress. It follows, of course, that no executive agency nor the President can perform this function by regulations or executive orders. The decided cases hold in unequivocal terms that no officer of the government can waive the sovereign immunity of the United States from suit nor give its consent to be sued. *See* United States v. Shaw, *supra*, and United States v. U. S. Fidelity & Guaranty Co., *supra*, in both of which cases the Supreme Court held that no officer of the government could by his action give consent of the United States to be sued and thereby confer jurisdiction of such suit on the court. *See also*, Munro v. United States, 303 U.S. 36, 58 S.Ct. 421, 82 L.Ed. 633 (1938); Finn v. United States, 123 U.S. 227, 233, 8 S.Ct. 82, 31 L.Ed. 128 (1887); and Jones v. Tower Production Co., 120 F.2d 779, 782 (10th Cir. 1941). We must conclude, therefore, that E.O. 11478 and the HEW Regulations are totally ineffective to waive the sovereign immunity of the government from suit.

Actually, E.O. 11478 and the HEW Regulations do not purport to waive such sovereign immunity. They do not purport to vest legally enforceable rights in the plaintiff for a violation of the non-discrimination policy set forth therein, nor to create any cause of action in favor of the plaintiff. As is the case with the statute (5 U.S.C. § 7151), one looks in vain at the language of E.O. 11478 and the HEW Regulations for provisions authorizing the plaintiff to sue the United States under the circumstances of this case. Here again, the majority resorts to implication to give the plaintiff the right to sue the government in this court. In this regard, the majority opinion states:

* * * There is no statute that precludes relief * * *.

 * * * * * *

* * * [W]hen plaintiff made application for employment with a Federal agency, she came under the protection of the Executive Orders, which by terms and by *implication*, apply to applicants as well as employees. * * * [Emphasis supplied.]

Such implications are subject to the same argument as that set forth above with reference to implications as to waiver of sovereign immunity from suit in connection with the statute. Even if the President or the HEW had the power to give the consent of the government to be sued, which they do not have, E.O. 11478 and the HEW Regulations here do not do so.

I now come to a consideration of the Tucker Act (28 U.S.C. § 1491) as amended, which is as follows:

The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

 * * * * * *

The plaintiff does not base her claim on this statute, but relies on E.O. 11478. The majority opinion states:

* * * The sole question for our determination is whether, in the circumstances, E.O. 11478 provides a legal basis for awarding back pay to such an *applicant* for Federal employment. * * *

Nevertheless, the majority opinion and the plaintiff seem to assume that 1491 gives the plaintiff the right to sue the government and confers jurisdiction on

this court to entertain the suit. There is no basis for this position.

In Congress of Racial Equality v. Commissioner, Social Sec. Admin., 270 F. Supp. 537 (D.Md.1967), a suit was filed to enforce Executive Order No. 11246 (the predecessor of E.O. 11478) concerning equal opportunity in Federal employment. The case was dismissed for lack of jurisdiction. The District Court, having concurrent jurisdiction with the Court of Claims with respect to actions under $10,000 based on any Act of Congress or regulation of any executive agency (28 U.S.C. 1346), held that E.O. 11246 was for guidance of the Federal agencies and no role was created for the judiciary in its enforcement. It is to be noted that 28 U.S.C. § 1346 is the same for District Courts, except for the $10,-000 limitation, as the Tucker Act (28 U. S.C. § 1491) is for the Court of Claims.

The case of Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966), involved the enforcement of Executive Order 10988 (27 Fed.Reg. 551) regarding the recognition of a postal union. The Court affirmed the order of the District Court dismissing the case for lack of jurisdiction and because of sovereign immunity saying:

> *Executive Order 10988 represents in essence a formulation of broad policy by the President for the guidance of federal employing agencies.* It had no specific foundation in Congressional action, nor was it required to effectuate any statute. It could have been withdrawn at any time for any or no reason. * * *

> The President did not undertake to create any role for the judiciary in the implementation of this policy. * * *

> * * * If appellants disagreed with the Postmaster General's decision as to this aspect of personnel policy, and believed it to be contrary to the President's wishes, it is obvious to whom their complaint should have been directed. It was not to the judicial branch. *Congress has given the District Court many important functions to perform, but they do not include policing the faithful execution of Presidential policies by Presidential appointees.* [Emphasis supplied]. [*Id.* 350 F.2d at 456–457.]

The most significant case involving jurisdiction and sovereign immunity in the enforcement of Executive Orders is Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969), cert. denied, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970). That case involved E.O. 11246, which later became E.O. 11478 that is involved in the case before us. That case was in many ways "on all fours" with our case and is dispositive of plaintiff's case here. The opinion in that case was written by Judge Blackmun, now Mr. Justice Blackmun of the Supreme Court. In that case the plaintiff sued the United States for damages because he had not been promoted as a government employee. The court dismissed the case for lack of sovereign immunity, saying:

> 1. One cannot sue the United States without its consent and a court has no jurisdiction of a suit against the United States to which it has not consented. United States v. Sherwood, 312 U.S. 584, 586–588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); Mancilla v. United States, 382 F.2d 269 (9 Cir. 1967), cert. denied, 390 U.S. 982, 88 S.Ct. 1104, 19 L.Ed.2d 1280. [*Id.* 415 F.2d at 1276.]

With regard to jurisdiction under the Tucker Act, the court said:

> The third or damage count remains. For the reasons set forth above, it, too, is dismissable as to all defendants named other than the United States. The plaintiff, however, bases the count specifically on the Tucker Act, 28 U. S.C. § 1346(a)(2), which gives the United States district courts original jurisdiction, concurrent with the Court of Claims, of

> > "Any other civil action or claim against the United States, not exceeding $10,000, in amount, founded either upon the Constitution, or any

Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort"

and thereby suggests the existence of consent to be sued. As to this, we adopt Judge Oliver's comments:

"The plaintiff does not allege that his alleged cause of action was created or authorized by any particular provision or section of the Constitution, Act of Congress, [or] regulation of any executive department. Nor does he allege what sort of an express or implied contract he attempts to base his claim. *None of the executive orders or regulations which the complaint cites purports to confer any right on an employee of the United States to institute a civil action for damages against the United States, in the event of their violation,* even if it should be established that plaintiff's failure to have been promoted as an employee of the Corps of Engineers was in fact due to discrimination in violation of the Executive Orders pleaded. *Congress has complete power either to create or to refuse to create such a remedy. It did not authorize civil actions for damages under any of the laws (including the Executive orders and regulations) applicable to facts pleaded by plaintiff in this case.* [Emphasis supplied.] [*Id.* at 1277–1278.]

The court in that case then proceeded to point out that plaintiff Gnotta had already received the administrative relief provided for in the Executive Order. We have already shown that the plaintiff in our case has received such relief by being given a job. On this point, the court in *Gnotta* said:

We emphasize that Executive Order No. 11246 enunciates government policy by way of prohibiting discrimination because of national origin; imposes that policy on the "head of each executive department and agency"; and directs the Civil Service Commission to "supervise and provide leadership and guidance", to provide for the impartial consideration of all complaints of discrimination, for at least one impartial review within the department, and for appeal to the Commission. *All this has been provided to plaintiff* Gnotta (except that he now challenges on appeal the impartiality of the trial examiner). *But none of the Executive Order's language speaks in terms of money damages or of a money claim against the United States.*

The third count, too, was properly dismissed. [Emphasis supplied.] [*Id.* at 1278.]

In the case at bar, the majority opinion finds implied consent for the government to be sued under the Tucker Act by certain provisions of the Administrative Procedure Act (5 U.S.C. §§ 702, 704). Judge Blackmun disposed of such a theory by saying in the *Gnotta* case:

* * * [T]he Administrative Procedure Act is not "to be deemed an implied waiver of all governmental immunity from suit." Blackmar v. Guerre, 342 U.S. 512, 514–516, 72 S.Ct. 410, 412, 96 L.Ed. 534 (1952); Bell v. Groak, 371 F.2d 202, 204 (7 Cir. 1966). [*Id.* at 1277.]

The majority opinion complains that "our line of [back pay] cases, expressing a different view [to that expressed in *Gnotta*] apparenly was not cited or considered [by Judge Blackmun]." The truth of the matter is that the back pay cases referred to (Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Glidden v. United States, 185 Ct.Cl. 515 (1968); Fletcher v. United States, 392 F.2d 266, 183 Ct.Cl. 1 (1968); Greenway v. United States, 163 Ct.Cl. 72 (1963), 175 Ct.Cl. 350 (1966), cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108; Daub v. United States, 292 F.2d 895, 154 Ct.Cl. 434 (1961); Starzec v. United States, 145 Ct.Cl. 25 (1959); Watson v. United States, 162 F.Supp. 755, 142 Ct.Cl. 749 (1958); and Simon v. United States, 113 Ct.Cl. 182

(1949)) do not express a different view. All of these cases involve the illegal discharge of employees who had been properly appointed to their jobs and had been fired in violation of statutes or executive agency regulations, or both. The back pay was awarded to them because they were considered as not having been discharged at all, since their discharge was illegal. This principle was aptly described by the Supreme Court in United States v. Perkins, 116 U.S. 483, 6 S.Ct. 449, 29 L.Ed. 700 (1886) (appealed from the Court of Claims) as follows:

"It follows that as the claimant * * * [was illegally discharged] he is still in office, and is entitled to the pay attached to the same." [*Id.* at 485, 6 S.Ct. at 450.]

To the same effect is United States v. Wickersham, 201 U.S. 390, 26 S.Ct. 469, 50 L.Ed. 798 (1906), which was also appealed from the Court of Claims. These cases are cited by the court in Borak v. United States, *supra,* as leading cases on this point.

The entitlement of an illegally discharged employee to back pay because he is considered as still in office is considerably different to a claimant demanding salary for a job to which he has never been appointed and which he has never held. Consequently, the majority opinion is in error in treating them alike and in saying that the awarding of back pay to illegally discharged employees by this court expresses a "different view" to that expressed by Judge Blackmun in the *Gnotta* case.

The majority opinion relies particularly on the language of the opinion in Simon v. United States, 113 Ct.Cl. 182 (1949) and quotes extensively from it. In that case the plaintiff was an illegally discharged employee who had lost his job in a reduction-in-force program in violation of a statute and agency regulations. Thus, it is obvious that the facts are completely different to the present case and the decision of the court is not in point. However, the court made it clear that the employee was entitled to his salary not only under the regulations,

but also under the Act of 1883. The court said:

* * * [W]e think the plaintiff is entitled to recover the salary in question if the facts show, as they clearly do in this case, that during the period involved he was illegally deprived of the position *he had held* and the salary thereof under the terms and conditions of the Act of 1883 [22 Stat. 403; 5 U.S.C. § 633] and the regulations made and promulgated thereunder. [Emphasis supplied.] [*Id.* at 194.]

It is clear that the back pay cases of illegally discharged employees are not in point and are not precedents to show jurisdiction of the plaintiff's case in this court.

The majority opinion also cites back pay cases under the Veterans' Preference Act (58 Stat. 390) and military disability retirement compensation cases as authorities for the proposition that this court has jurisdiction of plaintiff's case. Those cases are not in point because they involve situations where the claimants were employees in the military service and entitled to compensation by reason of a particular statute or a statute and regulations based thereon. They do not involve a case, as here, where the claimant demands the salary of a job to which she had never been appointed and in which she had never rendered any services.

Executive Order 11478 on which plaintiff principally relies was nothing more than the statement of a policy by the President. It was for the guidance of Federal employing agencies, as stated in Congress of Racial Equality v. Commissioner, Social Sec. Admin., *supra,* and Manhattan-Bronx Postal Union v. Gronouski, *supra.* The President has many policies, such as those against inflation, against high interest rates, for full employment, for international peace, for adequate public housing, for law and order, against riots in the streets, against the busing of children from one neighborhood to another to integrate the races in the schools, and many others.

These policies do not vest any rights in individuals, nor give them a cause of action against the government if any of such policies are violated. These policies do not command nor even suggest the payment of money to any citizen where a policy is violated. This is the situation facing the plaintiff with respect to E.O. 11478. It was a policy for the guidance of Federal agencies and nothing more. If it was violated, the plaintiff has no right to sue the government in this court by reason thereof.

The same principles apply to a policy expressed in a statute (as in this case). The Supreme Court aptly described the effect of a statutory policy in Dodge v. Board of Education, 302 U.S. 74, 58 S. Ct. 98, 82 L.Ed. 57 (1937), when it said:

> * * * [A]n act merely fixing salaries of officers creates no contract in their favor and the compensation named may be altered at the will of the legislature. This is true also of an act fixing the term or tenure of a public officer or an employe of a state agency. The presumption is that *such a law is not intended to create private contractual or vested rights but merely declares a policy* to be pursued until the legislature shall ordain otherwise * * * [Emphasis supplied.] [*Id.* at 78–79, 58 S.Ct. at 100.]

The Tucker Act is not a blanket consent for the government to be sued in the Court of Claims in all cases involving an Act of Congress or a regulation of an executive agency. For instance, the Court of Claims does not have jurisdiction of suits for injunction, mandamus, declaratory judgment, or restoration to office of an illegally discharged employee, even though such suits are based on the violation of a statute or a regulation of an executive agency. The Court of Claims does not have jurisdiction of such suits because Congress has not given its consent for the government to be sued in the Court of Claims in such cases. Before a claimant can sue the United States in the Court of Claims on a claim based on a statute or an executive departmental regulation, he must show (1) the Congress has by statute expressly consented to such suit here, and (2) that he has a valid cause of action. The plaintiff has not met either requirement in the case before us.

The plaintiff asks us to place her in a job to which she was never appointed, to pay her the salary of the job she never earned, to issue a declaration of her rights, to pay her money not presently due, and to pay her damages on a claim sounding in tort. There is no consent by the government under the Tucker Act to be sued in this court on claims of this kind.

Judge Davis, in speaking for a unanimous court, in the case of Eastport Steamship Corp. v. United States, 372 F.2d 1002, 178 Ct.Cl. 599 (1967), set forth principles which bar the plaintiff's suit when applied to the case before us. In that case, the plaintiff bought foreign merchant vessels under the provisions of Sections 9 and 37 of the Shipping Act (46 U.S.C. § 808 (1965 Supp.)). The Act provided that the purchaser would have to get the permission of the Maritime Commission to sell the ships. Later, the plaintiff got an offer from a purchaser to buy the ships for $560,000. The Maritime Commission refused permission for the sale. Later on, plaintiff got another offer for the purchase of the vessels for $375,000. The Commission approved the sale and it was completed. Thereafter, the plaintiff sued the United States for the difference in price of the two offers as damages. In an exhaustive opinion, we set forth the principles on which a suit may be maintained in this court under the Tucker Act. The court said:

> Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort". *But it is not every claim in-*

*volving or invoking the Constitution, a federal statute, or a regulation which is cognizable here.* The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation. *In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.* See South Puerto Rico Sugar Co. Trading Corp. v. United States, 334 F.2d 622, 626–627, 167 Ct. Cl. 236, 244–245 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965). [Emphasis supplied.] [*Id.* 372 F.2d at 1007, 178 Ct.Cl. at 605.]

\* \* \* \* \* \*

The second category includes the varied litigations in which we are urged to hold that some specific provision of law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet. Familiar examples are inverse eminent domain by a taking without formal proceedings (United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); a suit by a separated reserve officer for disability retired pay (Lemly v. United States, 75 F.Supp. 248, 109 Ct.Cl. 760 (1948)); an action for back pay occasioned by a wrongful dismissal from the civil service (El-

chibegoff v. United States, 106 Ct.Cl. 541 (1946), cert. granted, 329 U.S. 704, 67 S.Ct. 187, 91 L.Ed. 613 (1946), cert. dismissed, 329 U.S. 694, 67 S.Ct. 629, 91 L.Ed. 607 (1947)); or a claim for compensation for flood damage authorized by statute (United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950)). See, also, United States v. Central Eureka Mining Co., 357 U.S. 155, 162–165, 169–179, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961). In this type of case, we have held, "a claimant who says that he is entitled to money from the United States because a statute or a regulation [or the Constitution] grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable." Ralston Steel Corp. v. United States, 340 F.2d 663, 667, 169 Ct.Cl. 119, 125 (1965), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723.

*Monetary claims which cannot be brought within these limits are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation.* This is the reverse of saying that this court is not concerned with any and all pecuniary claims against the Federal Government, simply because they rely upon (and in that sense are "founded upon") an aspect of federal, constitutional, statutory or regulatory law. Where the claimant is not suing for money improperly exacted or retained (the first class defined above), *the historical boundaries of our competence have excluded those instances in which the basis of the federal claim— be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery.* A federal crim-

inal defendant, for instance, who has been invalidly convicted or deprived of his liberty because of a violation of the Constitution or an Act of Congress cannot obtain compensation under 28 U.S.C. § 1491 for his loss (although remedies may occasionally be available under the unjust conviction sections (28 U.S.C. §§ 1495, 2513) or some parts of the civil rights legislation). The provisions which void the conviction do not direct the payment of damages for the consequences of the illegality. Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained. If not, this court cannot give relief under Section 1491, although some separate general principle—arising, for example, from tort law—might lead to a remedy in another forum or under some special relief provision. [Emphasis supplied.] [Id. 372 F.2d at 1008–1009, 178 Ct.Cl. at 606–607.]

\* \* \* \* \* \*

\* \* \* There is not a word in the text suggesting that the United States will compensate an applicant who suffers a business loss because of the Commission's improper failure to grant the request. Nor are we pointed to anything in the Act's legislative history hinting at that result. There is no decision of this or any other federal court holding or intimating that the United States will be liable under the Tucker Act for such a commercial injury resulting from a failure or wrong done in the course of the regulatory process. *We would have to break entirely new and treacherous ground to find in Section 9 an implied directive to allow such compensation. We decline to take that giant step.* \* \* \* [Emphasis supplied.] [*Id.* 372 F.2d at 1009, 178 Ct.Cl. at 608.]

Under this decision, the plaintiff's claim is clearly outside the jurisdiction of this court. There is no allegation by the plaintiff that any particular provision of the law grants her "a right to be paid a certain sum." Since there is not a word in the statute, the regulation or the executive order commanding or even suggesting the payment of money to the plaintiff, and since she has to invoke some other principle of damages if she is to recover, this court does not have jurisdiction of her case. This is the plain and unequivocal holding of this court in the *Eastport* case. The majority is truly breaking "entirely new and treacherous ground" in legislating that "by implication" it is authorized to pay the plaintiff the salary of a job to which she was never appointed and in which she never served. Certainly Congress has never given consent for the government to be sued in such a case.

*6. This Court does not Have Jurisdiction of Plaintiff's Case Because Her Claim Sounds in Tort.*

The plaintiff is not suing on a contract. She is not suing for money presently due, as she was never appointed to the job involved here and never performed any services. No court having equity powers has ever declared her rights to the salary incident to the job. Until these requirements are met, United States v. King, *supra,* bars her recovery of salary in this court. Yet the plaintiff sues here for $18,000 as damages for the alleged misconduct of Mr. Billings, the HEW official, in refusing to appoint her to a job. Such an action is one sounding in tort by statutory definition. We only have to look at the Federal Tort Claims Act (28 U.S.C. §§ 1346, 2680 (1964)) to find that this is true. Section 2680(a) excepts from coverage claims for injuries based on the act or omission of a government employee in the execution of a statute or regulation, or based upon the performance or the failure to perform a discretionary function by a Federal agency or government employee, whether or not the discretion involved be abused. The statute is as follows:

§ 2680. Exceptions.

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The statute could not have been written in any different manner that would have covered the plaintiff's claim more completely than it does now. It fits the plaintiff's case "like a glove." This is true because her claim is based on the act or omission of Mr. Billings, in the exercise of his official duties under the statute and regulations, governing his department, in refusing to employ the plaintiff. Furthermore, Mr. Billings and his agency were performing a discretionary function, and even if this discretion was abused, the plaintiff has no cause of action because of it.

The same situation existed in Eastport Steamship Corp. v. United States, *supra.* There we held that the plaintiff's claim based on the refusal of the Maritime Commission to grant the permit for the sale of the ships came squarely within the terms of Section 2680(a) and was a tort action. Judge Davis in speaking for the court in that case said:

> * * * Congress has always withheld from this court and from the Tucker Act original jurisdiction over tort claims against the Government (Gibbons v. United States, 75 U.S. (8 Wall.) 269, 274–275, 19 L.Ed. 453 (1868); Langford v. United States, 101 U.S. 341, 25 L.Ed. 1010 (1879); Bigby v. United States, 188 U.S. 400, 23 S.Ct. 468, 47 L.Ed. 519 (1903); J. Ribas y Hijo v. United States, 194 U.S. 315, 323, 24 S.Ct. 727, 48 L.Ed. 994 (1904)); and liability for damages occasioned by wrongful regulatory action smacks more of tort than of non-tortious obligation. [372 F.2d at 1010, 178 Ct.Cl. at 609.]

> \* \* \* \* \* \*

Dalehite v. United States, 346 U.S. 15, 26–30, 32–34, 35–38, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), makes it absolutely plain that the Maritime Commission's function in acting under Section 9 was discretionary and that there would be no liability under the Tort Claims Act even if the agency abused its discretion (as plaintiff asserts). The discretion protected by § 2680(a) "is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." *Id.* at 34, 73 S.Ct. at 967. "Where there is room for policy judgment and decision there is discretion." *Id.* at 36, 73 S.Ct. at 968. And "it is clear that the * * * clause as to abuse connotes both negligence and wrongful acts in the exercise of the discretion * * *. The exercise of discretion could not be abused without negligence or a wrongful act." *Id.* at 33, 73 S.Ct. at 967. The legislative history of the Tort Claims Act fully and specifically supports these holdings. *Id.* at 27–30, 73 S.Ct. 956. [372 F.2d at 1010, 178 Ct.Cl. at 610.]

> \* \* \* \* \* \*

* * * If plaintiff had sued under the Tort Claims Act, its action would undoubtedly have fallen afoul of Section 2680(a), the "discretionary function" exception. If the suit in this court had asserted, without relying directly on Section 9 as the basis of the claim, a wrongful refusal by the Maritime Commission to approve the transfer, the petition would clearly have to be dismissed as a demand, founded in tort, for business damages due to misconduct. See Part II, *infra.* We cannot evade these barriers by incorporating into Section 9 something which is not there, either in terms or by fair implication—a mandate for compensation. Rather, we must follow the

admonition of the Supreme Court, almost a century ago, "to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a remedy, Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims." Gibbons v. United States, *supra*, 75 U.S. (8 Wall.) at 275–276. [372 F.2d at 1011, 178 Ct.Cl. at 611.]

Again in Bulloch v. United States, 133 F.Supp. 885, 887 (D.Utah 1955), the court stated the correct rule as follows:

The Tort Claims Act, including its exceptions, is too well known and has been too frequently construed to justify here a detailed review of its terms or legislative history, or a general survey of the cases interpreting it. See Annotation 1 A.L.R.2d 222. The principle controlling in this case is that there can be no recovery against the Government on any claim based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved was abused. 28 U.S.C.A. § 2680(a); annotation 19 A.L.R.2d 845.

Where the acts or omissions relied upon are those directly involving the exercise of discretion, the Courts have not hesitated to deny recovery, whether the discretion was regarded as properly, improperly or negligently exercised. Smart v. United States, 10 Cir., 1953, 207 F.2d 841; Chournos v. United States, 10 Cir., 1951, 193 F.2d 321, certiorari denied 343 U.S. 977, 72 S.Ct. 1074, 96 L.Ed. 1369; Coates v. United States, 8 Cir., 1950, 181 F.2d 816, 19 A.L.R.2d 840; North v. United States,

D.C.D.Utah, Cent.D., 1950, 94 F. Supp. 824, 19 A.L.R.2d 845. * * *

See also United States v. Morrell, 331 F. 2d 498 (10th Cir. 1964); and Morton v. United States, 97 U.S.App.D.C. 84, 228 F.2d 431 (1955).

The foregoing authorities show beyond any question that plaintiff's claim sounds in tort and her case should be dismissed for lack of jurisdiction. There would be no purpose served by transferring her case to a district court, as Section 2680 (a) bars her claim there as well as here.

## II

### *The Facts Show There Was No Racial Discrimination Against The Plaintiff In This Case*

Racial discrimination means to discriminate against a member of one race of people or in favor of a member of a different race because of race. That did not happen here. The plaintiff is a member of the Black race. She is a Negro. When she was denied a government job, her cousin, who was also a member of the Black race and a Negro, was appointed to the job. No other race of people was involved and no member of any other race was even considered, much less appointed to the job. If there was any discrimination, it was between two Negroes as individuals and without regard to race. All of this is shown in the letter from Mr. Dewberry, Regional Assistant Commissioner as follows:

We recommend she be advised there was no discrimination based on race, color, religion or national origin. In her letter of June 27, 1967, she points out that we employed her cousin to fill the vacancy for which she was considered. Obviously, the selection was made between two minority applicants —one with no prior service whose references were good, and one with prior service whose last employer in Beckley would not reemploy her.

When the plaintiff filed her complaint of racial discrimination, it was assigned by the HEW to Mr. Walter Statham for

an investigation. He made the investigation on May 29, 1967, by interviewing the plaintiff and Mr. Billings and others in Beckley, West Virginia. He reported that Mr. Billings had denied employment to the plaintiff because of an unfavorable report from a private hospital where she had last worked. But he found no fault with this, saying:

However, in doing so, he did not err under existing, applicable policies and regulations.

He further found:

\* \* \* [T]he complainant, in seeking employment was *not* discriminated against, because of race, by the Social Security Administration and/or the district manager.

He stated in his recommendations:

In effect, I have found that SSA and/or the district manager committed no wrong against her.

It is interesting to note that the investigator also stated in his report:

However, she [the plaintiff] concedes that SSA and/or the district manager may not have discriminated against her directly \* \* \*.

The investigator made his report to Mr. M. D. Dewberry, Regional Assistant Commissioner, who, in turn, made his recommendation to Mr. Louis Zawatzky, Deputy Assistant Commissioner for Employer Relations as follows:

We recommend she be advised there was no discrimination based on race, color, religion or national origin.

Mr. Zawatzky then wrote the plaintiff his decision as follows:

After a careful evaluation of the investigative file, I have concluded that discrimination was not a factor in your non-selection for employment in the district office.

The plaintiff then requested a hearing.

The HEW referred the case to an examiner. A hearing was duly held and plaintiff and other witnesses appeared and testified. The evidence at the hearing revealed that Mr. Billings was about to hire the plaintiff when he got an unfavorable report about her from one of her references, namely, the Beckley Appalachian Regional Hospital, which was a private institution where the plaintiff last worked. The report was that she was a "trouble maker of the first water." Mr. Billings decided not to hire her and hired another Negro instead. The plaintiff testified in pertinent part as follows:

I feel that, based on the recommendation that he [Mr. Billings] received from the \* \* \* Hospital, that it wasn't thoroughly evaluated or thoroughly investigated because this is where the basis of the racial discrimination existed and at this point it was picked right up by his office and I was right back where I started really.

\* \* \* \* \* \*

Q. Miss Bennett [Chambers], as I take it, a central part of your charge is that, in acting on references received from the hospital, Mr. Billings and the Social Security office acted in a racially discriminatory way by not looking behind or into the events that led to the reference from the hospital. Is that correct?

A. That is correct, sir.

Q. I believe it is your position that, if the references had been satisfactory, You would have been hired.

A. This is correct.

Q. So, that, without leading, aside from this point—the references, you would not make a charge of discrimination on the part of Mr. Billings or the Social Security office; that is, they were prepared to hire you.

A. This is my feeling, sir.

Q. So, whatever discrimination you believed to have happened was not with respect to your being considered for the job from the very beginning, but only with respect to Mr. Billings' reaction to reference checks that he made.

A. Yes.

The plaintiff testified further:

So, actually, it was racial tension [at the hospital] and it was, in turn, transmitted to the Social Security of-

fice. Whether Mr. Billings was aware of it, I have no knowledge of this, or what added to it in these regards.

\* \* \* \* \* \*

\* \* \* I truthfully couldn't say that Mr. Billings is prejudiced. I couldn't say this. Its just a matter that he got hung up through an unfavorable reference where racial tension was involved.

Mr. Billings testified that it was a routine practice to get references from applicants and to check them out. If one of them was unfavorable, he would refuse employment. He said that at a previous time he got a similar report on a white girl applicant (that she was a trouble maker) and he refused to hire her. He testified further:

Q. Let me ask you this. If Miss Bennett [the plaintiff] had been white and you had gone to this depth that you did and received the same information that you did, would you or would you not have hired her?

A. I would not have.

\* \* \* \* \* \*

Q. In other words, Miss Bennett's race had nothing to do with this consideration.

A. None whatever.

Mr. Snyder, attorney for the Social Security office stated at the hearing:

\* \* \* Miss Bennett's charges amount to discrimination by a chain reaction. There have been no discriminatory practices charged to Mr. Billings or anyone in connection with the Social Security Administration in that they directly discriminated against Miss Bennett, but their discrimination allegedly came about when they accepted or acted on a reference which was given by someone who, according to Miss Bennett, is allegedlly discriminatory.

The only other witness was a Reverend Johnson. He testified Miss Bennett was qualified, but he didn't know the facts of the case. He said further:

As President of the Raleigh County NAACP, I am chiefly concerned about discriminating practices, you know; if that's the case, we are concerned, but, if not the case, then—That's all I have to say.

After the hearing the testimony was typed and copies furnished to both parties for corrections. None were made. In due time, the examiner announced his decision, which was as follows:

It is my conclusion, based on the testimony at the hearing, that there is no evidence of racially discriminatory behavior or action on the part of the Beckley Social Security Office.

As can be seen from the evidence, the decision of the examiner was correct. As a matter of fact, the plaintiff did not charge the Social Security office or Mr. Billings with racial discrimination toward her, nor did she so testify. Her complaint was that there had been racial discrimination against her in the private hospital where she last worked. No one knew whether this was true or not and neither Mr. Billings or his office had any right to investigate it. Certainly, they were in no way responsible for what went on at the private hospital.

These facts show that the claim of the plaintiff was without substance, lacking in merit, and actually frivolous.

But there is more. A Mr. Samuel M. Hoston, Director of Equal Opportunity Staff in the Office of the Director of Equal Employment Opportunity of the Department of Health, Education and Welfare, overruled the decision of the examiner, and that of Mr. Zawatzky, and that of Mr. Dewberry, and that of Mr. Statham, the investigator, and handed down a decision in favor of the plaintiff as follows:

We find that the denial of equal opportunity for employment in the instant case was based substantially on the *applicant's previous racial discrimination complaint* and that such denial constituted a violation of Executive Order 11478 and Department regulations pursuant thereto. [Emphasis supplied.]

In rendering this decision, Mr. Hoston admittedly ignored the evidence at the hearing and based his decision on Mr. Statham's investigative report, yet he ignored Mr. Statham's findings and recommendation of non-discrimination toward the plaintiff. His decision that the plaintiff was racially discriminated against and that the hiring of another Negro did not obviate the charge of racial discrimination against the plaintiff, are pure conclusions of law, not based on any evidence, and are not binding on this court. His entire decision is based on an alleged "previous racial discrimination complaint" which he assumes was made by her while employed at the private hospital and before she applied for the job involved here. The HEW had nothing to do with that complaint, if one was filed, did not know about her filing it, if it was filed, and was in no way responsible for it, if it did exist. Such previous complaint, if there was one, is completely outside the record of this case, was never proven at the hearing or before the investigator, and no one knows the basis for it, what was contained in it, nor what happened to it, nor if it actually existed.

Furthermore, the above-quoted decision of Mr. Hoston is a pure conclusion of law, not based on any evidence and is not binding on this court.

Mr. Hoston also stated in his decision:

> * * * [T]he SSA District Office in Beckley, West Virginia, failed to answer Mrs. Chambers' charge that it operated in and was unduly influenced by an environment of racial discrimination.

This is a rather odd statement. If it was meant to be a requirement of the law, it was clearly wrong. The burden was on the plaintiff to prove that the HEW had racially discriminated against her and not on the government. Furthermore, when Mr. Hoston followed this statement with—

> Mrs. Chambers was indeed discriminated against, and we feel that the SSA personnel involved in this case were

cavalier in their denial of the serious charge of racial discrimination.

it indicated that he was holdng the government responsible for the racial attitude and morals of the entire Beckley Community. This cannot be the law. Otherwise, everytime a qualified Negro applied for a government job in a community where the "racial environment" did not satisfy someone like Mr. Hoston was was refused employment, a job would have to be created for him. Suppose one hundred qualified Negroes applied for jobs at one time and were denied employment. According to Mr. Hoston's formula and philosophy, the government would have to create 100 jobs for them. Imagine the chaos that would result if this "fuzzy thinking" and "far out" philosophy were applied to the thousands of government offices throughout the country.

Actually, Mr. Hoston's conclusion that the office at Beckley operated in an environment of racial discrimination was aparently based on the statement of one Mr. Payne, a Negro, who stated that the SSA and all other agencies of the government, and Mr. Billings and the hospital in Beckley all discriminated against Negroes. It developed that Mr. Payne was disgruntled because his wife had applied for a job two or three times at the SSA and had been turned down. The comment of Mr. Stratham, the investigator, about Mr. Payne's charges was as follows:

> (Note: Mr. Payne's general charges of discrimination against the district office are not, in my judgment, well-founded. In addition, while I was not in Beckley to investigate such charges, I did receive testimony strongly indicating a propensity on Mr. Payne's part to make frivolous charges of racial discrimination against diverse and sundry institutions, individuals, and agencies.)

As indicated above, the plaintiff's charges of racial discrimination and Mr. Hoston's decision were based on alleged discrimination at the hospital. This was

disputed by Reverend Mitchell, Pastor of the Ebenezer Baptist Church in Beckley and a member of the Advisory Council of the hospital. In commenting on Reverend Mitchell's statement during the investigation, the investigator (Mr. Statham) said:

Rev. Mitchell said he feels that both the BARH [the hospital] and the district office have good records and images from a race relations standpoint. He cited this as the basic reason for lack of complaints of racial discrimination against the district office and hospital, where he serves as a member of the community's advisory council.

Whether or not there was racial discrimination at the hospital was, therefore, a disputed question. We do know that the plaintiff never proved it, but Mr. Hoston assumed it existed and based his decision on it. Actually, it should not have even been considered in this proceeding, whether it occurred or not.

The record shows that there was another reason besides the adverse report from the hospital why Mr. Billings did not hire the plaintiff. He noticed certain personality traits in his talks with her that caused him to doubt that she could get along with other workers. This is shown in Mr. Dewberry's letter as follows:

Also, the manager had some other reservations about Miss Bennett's [plaintiff] attitude from several contacts with her that he considered of minor importance until the former employer questioned her ability to get along with co-workers.

Of course, Mr. Billings was exercising proper discretion as an employing officer in making these observations. The report from the hospital merely served to confirm what he had already observed. Mr. Hoston paid no attention to these facts.

Actually, Mr. Hoston ignored the facts in the case, all of which showed no racial discrimination at the SSA office against the plaintiff, and went outside the record to an *alleged prior* racial discrimination compliant by the plaintiff in a private industry in order to find a way to rule for the plaintiff. When all of these factors are considered, it causes one to wonder if Mr. Hoston indulged in bias or prejudice in favor of the plaintiff instead of Mr. Billings being guilty of prejudice against her.

The majority opinion makes much of the fact that the attorney for the government at oral argument of this case admitted that the HEW had discriminated against the plaintiff because of race and that but for such discrimination she would have been employed. We are not bound by any such admission because it is not supported by the facts and is contrary to the evidence. We are only puzzled why he made such an admission under the circumstances. In H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115 (1965), we held that a formal stipulation of the parties that was contrary to the evidence was not binding on the court.[1] The government attorney's admission here does not rise to the level of a stipulation, and we are not bound by it. Furthermore, his admission was a conclusion and a speculation on his part, which does not bind the court.

There is still more. The plaintiff was not through. She appealed to the Board of Appeals and Review of the Civil Service Commission from the Hoston decision. The Board did not go into the facts further than to "rubber stamp" the Hoston decision and order a job created for the plaintiff, but denied her request for retroactive appointment to the time of her original application for a job and the salary incident thereto.

Being still dissatisfied, the plaintiff filed this suit for $18,000 damages.

1. See also Federal Export Corp. v. United States, 25 F.Supp. 109, 88 Ct.Cl. 60 (1938), cert. denied, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939).

## III

*Conclusion*

Being firmly convinced that we do not have jurisdiction of plaintiff's case and that there was no racial discrimination against her by the SSA office or its manager in denying her government employment, I would deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment and dismiss the plaintiff's suit.

COLLINS, J., joins in the foregoing dissenting opinion of SKELTON, J.

59 CCPA